# UNITED STATES *v.* RYDER & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF NEW JERSEY.

Argued December 12th, 1883.—Decided March 10th, 1884.

*Subrogation—Recognizance.*

Without an express contract of indemnity a surety on a recognizance for the appearance of a person charged with committing a criminal offence against the laws of the United States, cannot maintain an action against the principal to recover any sums he may have been obliged to pay by reason of forfeiture of the principal, and he is not entitled to be subrogated to the

rights of the United States, and to enjoy the benefit of the government priority.

Subrogating a surety on a recognizance in a criminal case to the peculiar remedies which the government enjoys is against public policy, and tends to subvert the object and purpose of the recognizance.

§ 3468 Rev. Stat. conferring on sureties on bonds to the United States who are forced to pay the obligation the priority of recovery enjoyed by the United States does not apply to recognizances in criminal proceedings, and does not authorize an action in the name of the United States.

The bill in this case was filed at the suit of the United States to obtain payment of a recognizance for $10,000 from the property of one Edward P. Williams, or the proceeds thereof, in the hands of Seth B. Ryder, one of the defendants. The recognizance was entered into on the 8th day of November, 1876, by Williams and three other persons, conditioned that Williams "should appear in person at Trenton, before the United States District Court there, and submit to such sentence as the said court should order and direct."

Williams did not appear according to the condition of the recognizance, but absconded, and, as the bill alleges, "became a fraudulent, absconding, concealed and absent debtor, and at the same time was a convicted criminal and a fugitive from justice," and never has since appeared nor been found. The bill further alleges that a *scire facias* was issued, and a judgment entered upon the recognizance, and an execution issued to the marshal of the district against the goods and lands of the cognizors; and that certain real estate of the sureties was levied upon, insufficient (as alleged) to satisfy the execution; but that no levy was made upon the goods and lands of Williams, for the reason that they were in the possession of said Ryder, who claimed the right to hold the same partly as assignee under a general assignment made by Williams for the benefit of his creditors in July, 1876, and partly as auditor in attachment appointed by the Circuit Court for the county of Union, in the State of New Jersey, under an attachment issued against Williams on the 15th of November, 1876, and levied on the 23d of same month. The bill alleges that Ryder has since sold the property in his possession by order of the Circuit

Court of Union County, and has in his hands the proceeds, amounting to several thousand dollars.

The defendant demurred to the bill, and the demurrer was sustained and the bill dismissed. From that decree the plaintiff appealed to this court.

*Mr. Assistant Attorney-General Maury* said that the United States had no interest in the suit: that the real promoters were the sureties on the bond, who claimed to be subrogated in the place of the United States.

*Mr. J. Hubley Ashton* for Woodruff, Clarke, and Kipling, sureties of Williams.

*Mr. John R. Emery* for appellees.

Mr. Justice Bradley delivered the opinion of the court. After stating the facts in the foregoing language, he continued:

The grounds on which relief seems to be claimed by the bill, as far as can be gathered from the statements and the argument of counsel, are: *First.* That the United States is a judgment and execution creditor, whose remedy at law is exhausted, and that the funds in the hands of Ryder are equitable assets which ought to be applied in satisfaction of the judgment: *Second.* That the recognizance operated as a lien on the real estate of Williams from the time of its acknowledgment and recordation: *Third.* That under the act of Congress in that behalf, the United States is entitled to priority over all other creditors of Williams, he being insolvent, and having made a general assignment of his property for the benefit of his creditors, and his property being attached as that of an absconding debtor: *Fourth.* That the sureties of Williams have, by way of subrogation, a right to the enforcement of all the remedies which the United States is entitled to against Williams' property, before resort can be had against them and their property, or to indemnify them in case of their satisfying the claim of the United States; it being conceded on the argument that the bill was filed, and that the suit is prosecuted in the interest and

for the benefit of the sureties. The allegation on this subject in the bill is as follows:

" And your orator further shows that the said sureties, being aware that the said Seth B. Ryder has in his hands a large amount of money belonging to their principal and subject to the statutory claim of your orator to priority, as aforesaid, have claimed, as a right belonging to them as sureties, that your orator before selling their lands under said execution should seek relief in this court to compel the said Seth B. Ryder to apply the said fund to the satisfaction of said execution, as he is bound to do by the statute, giving your orator a priority upon said fund, in order that the said moneys of their principal in the hands of said Ryder may be applied to your orator's claim in exoneration of the said sureties, so far as the same will extend."

At the coming on of the argument on this appeal, the Solicitor-General of the United States stated, in open court, that the government has no interest in the suit, the amount of the recognizance having been paid by the sureties; and that the suit is prosecuted for the benefit of the sureties only; and this statement was admitted by the counsel for the sureties, who alone argued the cause for the appellants.

The questions for us to decide are:

First, Whether, since the recognizance has been paid by the sureties, they are subrogated to the rights of the United States:

Secondly, Whether, if thus subrogated, they are entitled to prosecute in the name of the United States:

Thirdly, If the first two questions are to be answered in the affirmative, whether a case is made by the bill to entitle the complainants to relief.

First: Are the sureties subrogated to the rights of the United States? The general right of sureties, when paying the debt of their principal, to be subrogated to the rights of the creditor, whether as a mortgagee, pledgee, or holder of a judgment or execution, or any other security, has been so often and so fully discussed that nothing further need be added on that subject. The recent treatise of Mr. Sheldon on the Law of Sub-

rogation, and the notes to *Dering* v. *Earl of Winchelsea*, in 1 White and Tudor's Leading Cases in Equity, 100, refer to the authorities, and exhibit the general results deducible therefrom; and in Mr. Burge's Treatise on Suretyship the rules of the civil law on the same subject are fully set forth. The doctrine is, that a surety paying the debt for which he is bound, is not only entitled to all the rights and remedies of the creditor against the principal for the whole amount, but against the other sureties for their proportional part. This is clearly the rule where the principal obligation is the payment of money or the performance of a civil duty. And in England the sureties of a debtor to the King (as for duties, taxes, excise, &c.), have always, since Magna Charta at least, had the right, upon paying the debt, to have the benefit of prerogative process, such as extent, or other Crown process adapted to the case, to aid them in coercing payment from the principal, and compelling contributions from co-sureties. Thus, where upon a *scire facias* issued against the heir and executor of one surety, the defendant paid the debt, it was ordered that he should stand in the place of the Crown, and have the aid of the court to recover either the whole against the principal, or a moiety against a co-surety. Manning's Exch. Pract. 563. And where a collector of a township [or parish] was a defaulter, and the township was re-taxed for the deficit, the same relief was given. Macdonald, Ch. Baron, said:

"The parish stands very much in the nature of sureties; and it is a reasonable practice that the party was has made good to the Crown the default of the defendant, should have the same remedy that the Crown itself would have; it is besides unanswerable that this is a debt upon record and still subsisting; nor can it be satisfied by the re-assessment of the parish." *Rex* v. *Bennett*, Wightwick, 1, and cases in note. See also *Regina* v. *Salter*, 1 Hurlst. & Nor. 274.

The last observation of the Chief Baron (that the debt of the collector was still subsisting), was made in view of the opinion which long prevailed in England, that payment of the debt by the surety extinguished it, and took away the remedies for en-

forcing it, even a judgment recovered, and thereby deprived the surety himself of all advantage of such remedies, and left him to his action for money paid—a result not recognized or admitted by most of the courts of this country, and remedied in England by the Mercantile Law Amendment Act, 19 and 20 Vict., c. 97, by virtue of which a payment of the debt by the surety has virtually the effect of an assignment thereof to him. Sheldon on Subrogation, §§ 135–138.

This rule of subrogation in favor of the sureties to the prerogative rights and remedies of the Crown seems to be confined to cases of Crown debtors, such as collectors, receivers, accountants and other fiscal officers, and persons bound for customs duties excise, taxes and other civil duties. We have not been able to find any English case in which it has been applied, or allowed, in favor of bail in a criminal proceeding. It has even been held that the law raises no liability on the part of the person bailed to indemnify his bail for what they have been compelled to pay on their recognizance by reason of his default. It is said in Highmore on Bail, 204, "if a principal do not appear, and the recognizance be forfeited, and paid by the bail, yet the principal shall remain open and liable to the law whenever he can be taken, for the penalty in the recognizance is no other than as a bond to compel the bail to a due observance thereof, and has no connection with the principal ; they could not sue him thereon for money paid to his use, or on his account, for it was paid on their own account, and for their own neglect." In a subsequent edition, it is true, it is said to have been settled that where a person is bail for another he is entitled to recover all the expenses he has incurred incidental to that situation ; and the same statement is made in Petersdorff on Bail, 517 ; but the only authority cited for the position is the case of *Fisher* v. *Fallows*, 5 Esp. 171, which was a case of bail in a civil proceeding, and consequently was no authority for the proposition as applied to criminal cases.

In *Jones* v. *Orchard*, 16 C. B. 614, an action on an implied promise to indemnify bail in a criminal case was sustained in regard to the costs which he was obliged to pay on default of principal under an act of Parliament, but it was virtually con-

ceded that no such promise of indemnity would be implied for the non-appearance of the principal, because it would be against public policy. In the course of the argument, Jervis, C. J., said : " As to the non-appearance of the defendant, there can, I apprehend, be little doubt ; but a very different question may arise as to the costs ; and here the recognizance was estreated only because Orchard failed to pay the costs." And in the final opinion he said :

"The rule [to set aside a verdict for the plaintiff] was moved on the ground that a contract, in a criminal case, to indemnify the bail against the consequences of a default of the principal's appearance on the trial of the indictment, is contrary to public policy, and therefore that the law will not presume any such contract. It is unnecessary to decide that point on the present occasion, although we are inclined to think the objection well founded, and that such a contract would be contrary to public policy, inasmuch as it would be in effect giving the public the security of one person only, instead of two."

In the subsequent case of *Chipps* v. *Hartnoll,* 4 B. & S. 414, it was held by the Court of Exchequer Chamber, upon much consideration, that an express contract to indemnify the bail in a criminal case might be sustained, but that no such contract is implied by law. In that case, the plaintiff had become bail for defendant's daughter upon his promise to hold the plaintiff harmless. The daughter making default, and the plaintiff being obliged to pay his recognizance, sued the defendant on his promise. The latter set up the statute of frauds, and the question was whether the promise was or was not a collateral one ; if the person for whose appearance bail was given (the daughter of the defendant) was in law liable to indemnify her bail, then the promise of the father was a collateral one, and void by the statute of frauds for not being in writing ; if she was not thus liable, then the father's promise was an original promise of indemnity, and the statute of frauds did not apply. The case was fully argued, first in the King's Bench, 2 B. & S. 697, and afterwards in the Exchequer Chamber on error. The King's Bench held, in deference to a former case of *Green* v.

*Cresswell,* 10 A. & E. 453, that the daughter was primarily liable, and that the promise of the father was collateral. But in the Exchequer Chamber it was pointed out that *Green* v. *Cresswell* was a case of bail in a civil, and not in a criminal, proceeding, and therefore not an authority in the case under consideration; and the court held that the daughter was not legally liable, and that the promise was not a collateral one; and reversed the judgment of the Court of King's Bench. Chief Baron Pollock, after pointing out the distinction, said:

"Here the bail was given in a criminal proceeding; and, where the bail is given in such a proceeding, there is no contract on the part of the person bailed to indemnify the person who became bail for him. There is no debt, and with respect to the person who bails there is hardly a duty; and it may very well be that the promise to indemnify the bail in a criminal matter should be considered purely as an indemnity, which it has been decided to be."

This decision (made in 1863) has not, so far as we are aware, been shaken by any subsequent case in England or in this country; and we think it is based on very satisfactory grounds. This may be more apparent when we consider the peculiar character and objects of bail in criminal cases as compared with the object and purpose of bail in civil cases. The object of bail in civil cases is, either directly or indirectly, to secure the payment of a debt or other civil duty; whilst the object of bail in criminal cases is to secure the appearance of the principal before the court for the purposes of public justice. Payment by the bail in a civil case discharges the obligation of the principal to his creditor, and is only required to the extent of that obligation, whatever may be the penalty of the bond or recognizance; whilst payment by the bail of their recognizance in criminal cases, though it discharges the bail, does not discharge the obligation of the principal to appear in court; that obligation still remains, and the principal may at any time be retaken and brought into court. To enable the bail, however, to escape the payment of their recognizance by performing that which the recognizance bound them to do, the government will lend them its aid in every proper way, by process and without

process, to seize the person of the principal and compel his appearance. This is the kind of subrogation which exists in criminal cases, namely, subrogation to the means of enforcing the performance of the thing which the recognizance of bail is intended to secure the performance of, and not subrogation to the peculiar remedies which the government may have for collecting the penalty; for this would be to aid the bail to get rid of their obligation, and to relieve them from the motives to exert themselves in securing the appearance of the principal. Subrogation to the latter remedies would clearly be against public policy by subverting, as far as it might prove effectual, the very object and purpose of the recognizance. It would be as though the government should say to the bail, "We will aid you to get the amount of your recognizance from the principal so that you may be relieved from your obligation to surrender him to justice." If payment of the recognizance operated as a satisfaction or composition of the crime, then the subrogation contended for might be free from this objection; for then the government would be satisfied in regard to the principal matter intended to be secured.

We have been referred by the appellant's counsel to two cases in this country which are supposed to maintain a contrary doctrine to that of the English cases above cited. These are *Reynolds* v. *Harral*, 2 Strobhart, 87, and *Simpson* v. *Roberts*, 35 Ga. 180. In *Reynolds* v. *Harral* (which was decided in 1847) it was indeed held that bail in a criminal case may maintain an action against their principal for money paid, to indemnify them for what they have been obliged to pay on their recognizance. But the case stands alone, and the point was very little discussed; and the court relied for authority upon the observation in Petersdorff on Bail, already referred to, which, as we have seen, was based on a decision at *nisi prius* in a civil proceeding, and was expressly overruled as applied to criminal cases in *Chipps* v. *Hartnoll*. The other case, *Simpson* v. *Roberts*, was one in which the principal executed a mortgage to the bail to induce him to enter into the recognizance, and the mortgage was sustained by the court. This decision entirely accords with that of *Chipps* v. *Hartnoll*. Neither of

the cases cited, therefore, can be regarded as affecting the authority of that case.

As to the act of Congress which declares that sureties on bonds given to the United States shall have the same right of priority which the United States have by law, we do not think that it contains anything to modify the result to which we have come. The act referred to is now to be found in § 3468 Rev. Stat., and is as follows:

"Whenever the principal in any bond given to the United States is insolvent, or whenever such principal being deceased, his estate and effects which come to the hands of his executor, administrator, or assignee, are insufficient for the payment of his debts, in either of such cases any surety on the bond, or the executor, administrator, or assignee of such surety, pays to the United States the money due upon such bond, such surety, his executor, administrator, or assignee, shall have the like priority for the recovery and receipt of the moneys out of the estate and effects of such insolvent or deceased principal as is secured to the United States; and may bring and maintain suit upon the bond in law or equity, in his own name, for the recovery of all moneys paid thereon."

We do not understand that this section was intended to embrace recognizances in criminal cases. The section is taken from, and is substantially a reproduction of, the proviso of the 65th section of the act to regulate the collection of duties, approved March 2d, 1799, 1 Stat. 676. That section related to bonds given for the payment of duties, and declared that, if not satisfied when due, they should be prosecuted without delay; and in all cases of insolvency, or where an estate in the hands of executors, administrators, or assignees should be insufficient to pay all the debts due from the deceased, the debt or debts due to the United States, on any such bond or bonds, should be first satisfied; and any executor, administrator, or assignee who should pay other debts before paying the United States, should be personally liable; and the proviso then declared that if the principal in any bond given for duties or goods, wares, or merchandise imported, or other penalty, should be insolvent, or if, being deceased, his estate should be insuffi-

cient to pay all his debts, and if, in either of such cases, any surety on the said bond or bonds, or the executors, administrators or assignees of such surety, should pay to the United States the money due upon such bond or bonds, such surety, &c., should have the like advantage, priority, or preference for the recovery of the said moneys out of the estate of such insolvent, or deceased principal, as were reserved or secured to the United States, and should and might bring and maintain a suit or suits upon said bond or bonds in law or equity in his, her, or their own name or names for the recovery of all moneys paid thereon.

The only difference between section 3468 of the Revised Statutes and this proviso is, that the latter in terms relates to bonds given for duties, whilst the former uses the more general terms "whenever the principal in any bond given to the United States is insolvent, &c." If it was intended by Congress to enlarge the scope of the section so as to include other bonds than those given for duties (as seems to be the necessary inference from the language), still it is restricted to "*bonds :* " the words are, " whenever the principal in any *bond* given to the United States is insolvent, &c.," and any "surety on the *bond* " pays the money due upon "such *bond*," such surety shall have the like priority, &c., and may bring and maintain a suit upon "the *bond* " in his own name, &c. This cautious phraseology, so carefully avoiding any general words of enlargement beyond the article of "bonds" alone, seems to imply that, in extending the peculiar privileges given to sureties, it was only intended to do so in reference to obligations of the same general character with those referred to in the original act, that is to say, bonds conditioned for the payment of money, or, at most, to embrace, besides, those conditioned for the performance of some civil duty, such as the faithful discharge of the duties of an office, &c. Had it been intended to include sureties for appearance in criminal cases, the word "recognizance," or some other appropriate term, or some general word adapted to the purpose, would naturally have been used. The revisers would not have proposed, nor would Congress have made, such a fundamental change in the law as the extension of this provision to criminal

cases, without employing more appropriate terms for that pur-
pose than those which the section contains. It will not be in-
ferred that the legislature, in revising and consolidating the
laws, intended to change their policy, unless such intention be
clearly expressed. *McDonald* v. *Hovey, ante,* p. 619.

Our opinion is that the right of subrogation does not exist in
this case.

But if the sureties were entitled under the act to the same
priority which the United States have, they are not entitled to
use the name of the United States in prosecuting their claim.
The statute expressly declares that they must sue in their own
names. The reason is obvious. The government has many
advantages in proceeding which are not possessed by individuals,
and is not liable to costs; and individuals prosecuting claims
against other individuals ought not to have the advantage of
the name and prestige of the United States. In the case of
*United States* v. *Preston,* 4 Wash. Cir. Rep. 446, the surety in
a duty bond, having paid the judgment recovered on it, brought
an action in the name of the United States, for his own use,
against the assignees of the principals, and contended that he
was entitled to every advantage which the United States are
entitled to in such a suit, as to sue in the federal court, to re-
quire special bail, to demand a trial at the return of the writ,
to exclude equitable defences, &c. The court, by Mr. Justice
Washington, held that the action could not be brought in the
name of the United States, but only in the name of the surety
himself, and that the only advantage which the law gave to the
surety was that of priority over other creditors, and not in
the form and modes of proceeding.

As it is conceded that the United States have received full
satisfaction of the recognizance on which the present suit is
based, and that this suit is not prosecuted for the benefit of the
United States, but solely for the benefit of the sureties, we are of
opinion that it cannot be sustained; but that the bill ought to
be dismissed, as well on the ground that the sureties are not
subrogated to the rights of the United States, as on the ground
that they cannot sue in the name of the United States.

This conclusion does not touch the merits of the case as set

up in the bill, considered as a bill filed by the United States on their own behalf and for their own use ; but the bill itself shows that it was filed for the benefit of the sureties, although they may not have paid their recognizance when it was filed. Without deciding, therefore, whether, on demurrer, the bill might or might not have been sustained, considered purely as a bill filed by the United States on their own behalf, we are satisfied that its dismissal by the court below was right, considered as a bill filed on behalf, and for the benefit of, the sureties. And as it is now admitted that the United States have been satisfied and paid, and as, for this reason, if for no other, the bill should be dismissed, our conclusion is that

*The decree of the court below be affirmed, but without costs—
each party to pay their own costs on this appeal.*