LEARY v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. December 7, 1910.)

No. 889.

EQUITY (§ 114*)—INTERVENTION—LACHES.

In a suit by the United States to establish its equitable ownership of certain securities, leave to file a petition of intervention setting up a pledge of the securities to intervener's intestate was rightfully denied on the ground of laches, where application was not made until more than four years after the suit was commenced and after all the testimony had been taken, and no reason for the delay was given, and also for want of equity where the petition did not allege that intervener's intestate did not have knowledge of the rights of the United States, which were established by the proofs, when the alleged pledge was made.

[Ed. Note.—For other cases, see Equity, Cent. Dig. § 277; Dec. Dig. § 114.*]

In Error to the Circuit Court of the United States for the Western District of Virginia.

Suit in equity by the United States against Benjamin D. Greene, Luther Lofflin Kellogg, and the Norfolk & Western Railway Company. From an order (United States v. Greene, 163 Fed. 442) denying the application of Mary C. Leary, administratrix of James D. Leary, deceased, for leave to file a petition of intervention, she brings error. Affirmed.

J. T. Coleman and A. E. Strode (David McClure, on the brief), for appellant.

Marion Erwin, Special Asst. Atty. Gen. (Thos. L. Moore, U. S. Atty., on the brief), for the United States.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

184 F.—28

Before GOFF and PRITCHARD, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. The appellant filed in the court below a petition for leave to intervene and a bill of intervention in the cause of the United States v. Benjamin D. Greene, Luther Lofflin Kellogg, and the Norfolk & Western Railway Company.

The original bill of the United States was filed December 13, 1903. It set forth with much detail the government's version of the conduct of Oberlin M. Carter, John L. Gaynor, and the defendant Greene in connection with public contracts for the improvement of Savannah Harbor and neighboring waters. Much litigation has made this story a familiar tale. It suffices here to say that the bill alleges that upwards of $2,000,000 was fraudulently obtained from the United States by Carter, Gaynor, and Greene. Subject to certain minor adjustments, this sum was equally divided among them so that Greene's share was in the neighborhood of $700,000. The bill further charged that, in order to prevent the United States from recovering this money, Greene put it in the name of other people to be held for his benefit. Among those who undertook to hold property for Greene was the defendant Kellogg. The bill alleges that $113,926.55 of the money so fraudulently obtained by Greene was placed by him in Kellogg's hands. A part of such money ultimately was invested in 400 shares of the stock of the Norfolk & Western Railway Company, which at the time the bill was filed was represented by certificates 5,896, 5,897, 5,898, 11,077, and 74,200. The bill alleged that such stock was still held by Kellogg for the use and benefit of Greene. It says that Kellogg had been counsel for Greene, Gaynor, and Carter during much of the protracted litigation, civil, criminal, and military, which had grown out of the Savannah frauds. Among other things, the bill prayed that such stock should be declared to be the property of the United States, and that pending the final hearing of the case made by the bill the defendant should be enjoined from disposing or transferring such stock.

The Norfolk & Western Railway Company answered that all it knew about the matter was that the stock appeared on its books in the name of Kellogg. It disclaimed all interest in the controversy and submitted to whatever decree the court might pass. Greene, though personally summoned, never appeared or answered, and as against him the bill was taken pro confesso. Kellogg demurred to the bill and filed with his demurrer a supporting affidavit. The court overruled the demurrer and treated the affidavit as an answer. In view of the subsequent course of the case, only a small portion of his answer had any relevancy to the questions raised on this appeal. It stated that when in December, 1899, Greene was first arrested in connection with these alleged frauds, Kellogg induced one Leary, a client and friend of his, to become bail in the sum of $25,000 for Greene's appearance before the United States commissioner in New York. Kellogg personally, so he said, gave Leary a written guaranty to protect the latter from loss or damage in consequence of becom-

ing such bail. Kellogg's answer further says that at about the same time Greene deposited with Kellogg some securities for the purpose of indemnifying Kellogg on this guaranty, with the understanding that Greene might at any time withdraw the deposited securities or dispose of them and substitute others in their place. Such securities it alleged were to be held by Kellogg to secure him and his firm for fees and disbursements in connection with the litigation then pending. Kellogg's answer states that the original securities were disposed of, and that the Norfolk & Western Railway Company stock in controversy was substituted for some of them. He says he held that stock as security to protect him for loss under his guaranty to Leary before mentioned or because of Leary having become surety in the sum of $40,000 for Greene's appearance in Georgia, Kellogg's agreement to indemnify Leary having been extended, the answer alleges, to said last-mentioned bond, and that he also held the stock to secure to himself and his firm the payment of their fees and disbursements.

The record shows that on June 2, 1904, the court below granted an order pendente lite restraining the transfer of the stock and the payment of dividends thereon. The case was put at issue by the general replication of the government filed in July, 1904.

Testimony was taken on both sides, and at the time of the filing of the petition for intervention the case was ready for final hearing. It is stipulated in the record that the United States had taken a large amount of evidence to sustain all its allegations, and that, although Kellogg testified in his own behalf, he did not take or offer any evidence to establish the contract of indemnity spoken of by him in his answer, nor did he take or offer any evidence that either he or his firm had any claim upon such stock for fees. It was further stipulated that in support of the motion for an injunction pendente lite the United States had offered evidence sufficient to establish that the 400 shares of Norfolk & Western Railway Company stock in controversy had been purchased March 26, 1900, by Kellogg in his own name but for the account of Greene with part of the funds derived from the sale of certain stocks of the Delaware, Lackawanna & Western Railway Company and of the Canada & Southern Railway Company sold by Kellogg March 23 and 26, 1900, and that the stocks so sold had been purchased by Greene in the name of Kellogg prior to December, 1899, the date of his first arrest, and that the money with which they had been purchased was a part of Greene's share of the funds coming from the Savannah contracts. It was further stipulated that, as evidence to be used at the final hearing, the government had offered testimony to prove the same facts, and that no evidence to contradict it had been offered, and that all the testimony was on file in the record of the cause prior to the presentation to the court on April 18, 1908, of the intervener's petition.

The petition for leave to intervene and the bill of intervention offered therewith alleged that the intervener was the administratrix of James D. Leary; that on December 11, 1899, Greene had been arrested in the Southern district of New York on a United States com-

missioner's warrant based upon an indictment found in the United States District Court for the Southern District of Georgia and was held in $25,000 bail; that either Greene or Kellogg applied to Leary to furnish this bail; that Leary became bail; that at the same time Greene placed in Kellogg's hands, as trustee and depositary to secure Leary against loss by reason of his having become bail, 300 shares of Delaware, Lackawanna & Western Railway Company stock upon the "condition and understanding that Kellogg should hold such shares of stock in trust for Leary until Leary was released from the bail bond, or, in case Leary's liability thereon should be established, that said shares of stock should be applied in payment of the obligation assumed by Leary"; that Greene withdrew the Delaware, Lackawanna & Western Railway Company stock and substituted the 400 shares of Norfolk & Western Railway Company stock upon the same terms and conditions; that on May 28, 1901, a warrant was issued for Greene's removal to Georgia; that he was admitted to bail in the sum of $40,000 for his appearance in Georgia for trial; that Kellogg applied to Leary to give such bail; that Leary did so on January 20, 1902, upon the condition and understanding that the securities held in trust and deposited by Kellogg should remain and continue in the hands of Kellogg as security and indemnity to Leary; that Greene did not appear for trial in the United States District Court for the Southern District of Georgia according to the terms of the recognizance, and therefore on March 7, 1902, the recognizance was forfeited, and the said District Court adjudged that the United States should recover from Greene and Leary $40,000, unless by the next term of the court they should show cause why such order should not be made final; that on January 12, 1903, the said judgment was made final and execution thereon awarded; that on September 10, 1903, the United States brought suit against the intervener in the United States District Court for the Southern District of New York to recover the amount of such recognizance; and that in said suit on January 6, 1908, judgment against the intervener was entered for $35,377.46, which judgment has not been paid, set aside, or reversed. The petition alleged that Kellogg holds the stock and its dividends as trustee and depositary and for the benefit and protection of the intervener, and that the intervener's claim upon, and right to, the stock is not liable to the claim of the United States "except to the extent of any surplus remaining after making full indemnity to the intervener."

The court below ordered that notice of the filing of the petition be given to the other parties to the cause. The United States objected to the granting of the leave prayed for. In so doing it said that the decree pro confesso established as against Greene the government's title to the stock, and that the government's title was good as against any person claiming under Greene and not a purchaser for value without notice, which in said petition the intervener did not allege herself to be. It further asserted that the petition did not allege that the contract under which the intervener claims was in writing, and therefore under the statute of frauds it was not

enforceable; that, whether in writing or not, such contract was against public policy; that the intervener was barred by laches in not presenting the petition at an earlier stage of the proceeding; and that in form and substance the intervention was without equity. The intervener did not offer to amend. The government's objections to granting leave to the petitioner to intervene were set down for hearing. The learned judge below was of the opinion that the bill was fatally defective in that it nowhere alleged that the petitioner's intestate at the time of giving bail was ignorant of the facts alleged in the original bill which imposed upon the securities in question a trust in favor of the government, and because it was not possible from the allegations of the petition to make out whether the contract of indemnity was express or implied. He pointed out that it is settled that the law does not imply an obligation upon the part of one charged with a criminal offense to indemnify his bail for any loss which the latter may suffer by reason of the former's failure to appear in accordance with the terms of his recognizance. United States v. Ryder, 110 U. S. 729, 4 Sup. Ct. 196, 28 L. Ed. 308. The learned judge was of the opinion that even an express contract made by a criminal to indemnify his bail is against public policy and is unenforceable. Leave to file the bill of intervention was therefore denied.

The intervener says that an express contract by one accused of crime to indemnify his bail is not against public policy. The government says it is.

A person held to bail in a civil case may indemnify his bail. United States v. Ryder, 110 U. S. 729, 4 Sup. Ct. 196, 28 L. Ed. 308; Cripps v. Hartnoll, 4 Best. & S. 414; Green v. Cresswell, 10 A. & E. 453; Perley v. Spring, 12 Mass. 297.

A contract, by one not accused of crime, to indemnify the bail of one who is, is enforceable. Cripps v. Hartnoll, 4 Best. & S. 414; Holmes v. Knights, 10 N. H. 175; Anderson v. Spence, 72 Ind. 315, 37 Am. Rep. 162; Keesling v. Frazier, 119 Ind. 185, 21 N. E. 552.

When the state by statute has provided for the acceptance of cash bail, contracts to indemnify bail are not against public policy. Maloney v. Nelson, 144 N. Y. 189, 39 N. E. 82; Moloney v. Nelson, 158 N. Y. 352, 53 N. E. 31.

When the bail at the time of receiving the indemnity knows that it is the intention of the accused not to present himself for trial, no recovery can be had on the contract to indemnify. Ratcliffe v. Smith, 13 Bush (Ky.) 172.

The Supreme Court has decided that the law does not imply a contract that one held to bail in a criminal case will indemnify his surety. United States v. Ryder, 110 U. S. 737, 4 Sup. Ct. 196, 28 L. Ed. 308.

In the case at bar the intervener relies upon an express contract of the accused to indemnify his bail.

In England such contracts are unenforceable. Wilson v. Strugnell, L. R., 7 Q. B. Div. 548; Herman v. Jeuchner, L. R., 15 Q. B. Div. 561. The English rule has been approved in Littleton v. State, 46 Ark. 413; United States v. Simmons (C. C.) 47 Fed. 577. On the other hand, the highest courts of South Carolina, Georgia, and West

Virginia ̤have ̤held such contracts valid. Reynolds v. Harral, 2 Strob. 87; Simpson v. Robert, 35 Ga. 180; Carr v. Davis, 64 W. Va. 522, 63 S. E. 326, 20 L. R. A. (N. S.) 58. The text-writers are as divided as the courts. · Highmore on Bail, 202, 3 Am. & Eng. Ency. 684, and 16 Am. & Eng. Ency. 172, hold such agreements to be against public policy. Pingrey on Suretyship, § 416, argues they are not. Brandt on Suretyship, §. 610, is frankly in doubt.

The question is important. There is much difference of opinion about it. · We should not pass upon it unless it is necessary to the decision of the case before us. In our view there is no such necessity.

Whether a contract by one accused of crime to indemnify his bail is or is not against public policy, the action of the court below in refusing the intervention was right and should be affirmed. "An intervention that savors of laches and is of doubtful equity will not be permitted." 2 Street's Federal Equity Practice, § 1373.

Where a petition for intervention was filed three years after it might have been, Judge Taft held that it was affected by laches. Continental Trust Company v. Toledo, St. Louis & K. C. R. Co. (C. C.) 82 Fed. 642.

In the case before us the petition for intervention was not filed until more than four years and three months after the institution of the suit. The facts disclosed by the record make it hard to believe that the appellant did not know of its pendency for years before she sought to intervene. She does not say that she was ignorant of its pendency. If she could have truthfully said so, it must be presumed she would. She gives no reason why she waited so long before seeking to come in. This she is bound to do. She incidentally states that judgment was not recovered against her by the United States on the forfeited recognizance in the United States Circuit Court for the Southern District of New York until January 8, 1908. The petition for leave to intervene was filed April 18, 1908, three months and ten days thereafter. She does not assign the date of the New York judgment as the reason why she did not seek to intervene at an earlier date. Legally it could not have been, and that for two reasons. The forfeiture of the recognizance for the appearance of Greene was made final and execution awarded thereon by the United States District Court for the Southern District of Georgia in January, 1903, more than five years before the filing of the petition in intervention in this case. Had the appellant had property in that district, it could and doubtless would have then been levied upon. She certainly then knew of what had happened and of the liability under which she had come. In the second place, the whole theory of her claim in this case is that she and her intestate have held a right in the securities at all times since the execution of the recognizance in 1902. · Such rights were assailed so soon as the government filed the original bill in this cause. It sought in disregard of them to have itself declared the beneficial owner of the shares of stock in controversy. If her present contention is sound, she was legally entitled to intervene so soon as she learned of the pendency of this cause. Suit was brought against her in the United States Circuit Court for the Southern District of New

York more than four years before she asked to come into the here pending controversy. She waited until all the testimony in the latter cause had been taken and until after it was ready for final hearing, and then for the first time sought to assert the rights she claims. If she be permitted to intervene, there will be further delay in determining the rights of the parties who have been so many years before the court. She does not say why she did not come in, when she had a right to come in as she now asserts and when her coming in would have saved so much time and money. Her unexplained delay, under all the circumstances of this case, requires the denial of her petition. This is especially true when it is borne in mind that she does not in her bill of intervention question that the United States was in truth and in fact the equitable owner of the securities at the time she says her intestate bargained with Greene and Kellogg for an interest in them, and that she does not allege that her intestate was without knowledge or notice of the rights of the United States to them. She has no possible case on any theory unless her intestate was a purchaser for value and without notice. When, more than four years after the suit was begun, she seeks to be let into it, she does not say that her intestate was without notice.

For all that is said in the petition to intervene and in the proposed bill of intervention submitted with it, the appellant's intestate when he went bail and bargained for indemnity may have known that Greene intended to fly to Canada, and that the securities in Kellogg's hands represented money fraudulently obtained from the United States, the appellant herself may have known of the pendency of the present suit years before she sought to intervene and may be now intervening because the defense set up by Kellogg therein has apparently broken down.

It is of course possible that no one of these things is true; but it was the duty of the appellant, when at this late day she asked permission to come into the case, to allege distinctly that they were not.

The petition for leave to intervene was properly refused.

Affirmed.