LEARY et al. v. UNITED STATES et al.

KELLOGG v. SAME.

(Circuit Court of Appeals, Fourth Circuit. November 12, 1915.)

Nos. 1277, 1278.

CORPORATIONS ⬤⟿123—PLEDGE OF STOCK—PLEDGEE AS BONA FIDE PURCHASER.

A federal prisoner, to indemnify the surety on his bail bond pending proceedings in New York for his removal to Georgia for trial, deposited certain stocks with a trustee. The bond was subsequently renewed, and at the conclusion of the proceedings another bond given to secure the appearance of the defendant in Georgia. All were signed by the same surety, and the stocks or others substituted for them remained in the hands of the trustee. The last bond was forfeited, and the judgment recovered thereon was paid by the estate of the surety. In a suit by the United States to recover the stocks, there was evidence tending to show that they had been bought with funds of which the defendant had defrauded the government. Held, on the evidence, that, conceding such fact, neither the trustee nor the beneficiary of the trust had any knowledge that the stocks were not honestly obtained, also·that the evidence established an agreement that they should remain for the protection of the surety as to all, and not merely the first bond, and that the right of his estate to the same was superior to that of the United States.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 481, 491, 507–512, 537, 539–546, 569, 618; Dec. Dig. ⬤⟿123.]

Appeals from the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry Clay McDowell, Judge.

Suits in equity by the United States against Luther Laflin Kellogg and Daniel J. Leary and George Leary, administrators of the estate

━━━━━━━━━

of James D. Leary, deceased. Decree for complainant, from which defendants separately appeal. Reversed.

Aubrey E. Strode, of Amherst, Va., and J. T. Coleman, of Lynchburg, Va. (Coleman, Easley & Coleman, of Lynchburg, Va., on the brief), for appellant administrators.

Abram J. Rose, of New York City, for appellant Kellogg.

Marion Erwin, Sp. Asst. Atty. Gen., for the United States.

Before KNAPP and WOODS, Circuit Judges, and WADDILL, District Judge.

KNAPP, Circuit Judge. For a preliminary statement of facts reference is made to the opinion of this court on the former appeal (184 Fed. 433, 107 C. C. A. 27), and the opinion of the Supreme Court, to which the case was afterwards taken (224 U. S. 567, 32 Sup. Ct. 599, 56 L. Ed. 889, Ann. Cas. 1913D, 1029).

The Supreme Court held that the petition filed by Mrs. Leary "showed a sufficient right to intervene," and that she ought to be allowed to try to prove her case, notwithstanding the objections which the courts below had sustained. Following this decision an amended petition was filed in May, 1913, which is substantially the same as the original, with the addition of a paragraph from the first answer of Kellogg, and an averment that she has paid the judgment of the United States against the Leary estate. The claims set up in this petition are controverted in the government's answer thereto, but the pleadings raise no issue between Mrs. Leary and Kellogg. There was a full hearing of the case in the court below, and a final decree entered in December, 1913, to the effect that the 400 shares of Norfolk & Western stock, which are the subject of controversy, belong to complainant, the United States of America, "free from the claims of all other parties hereto." No findings were made or opinion filed by the learned District Judge, and we are therefore not advised of the grounds upon which he based his decision. Separate appeals were taken by Mrs. Leary and Kellogg, but they are consolidated in a single record and may be disposed of in one opinion.

For the purposes of this appeal we shall assume, without discussing the evidence, that the Norfolk & Western shares, or securities for which they were substituted, were purchased by Greene with funds of which he had defrauded the government. It follows from this that the intervention cannot be sustained on the theory that the United States has failed to prove with requisite certainty that moneys stolen from it are represented by the stock in question; and nothing further need be said upon that branch of the case.

The first bond signed by Leary was on the 14th of December, 1899, and we think it must be held that neither Leary nor Kellogg then knew or had reason to believe that the securities which Greene placed in Kellogg's hands about that time were not honestly acquired. It is not claimed that Leary had any knowledge or even suspicion of Greene's misconduct, and the only ground upon which knowledge is sought to be imputed to Kellogg is the fact that he was Greene's at-

torney. But this of itself is not enough to justify the inference that he either knew or ought to have known that the securities which Greene turned over to him were the fruits of criminal wrongdoing. The presumption is to the contrary. Evans v. Mansur & Tebbetts Implement Co., 87 Fed. 275, 30 C. C. A. 640. Especially is this so since it appears that Kellogg had no personal connection with the defense of Greene in the criminal proceedings instituted against him until long after the transfer of the securities in question. Moreover, Kellogg meets the implication that he was cognizant of Greene's fraudulent conduct with explicit and positive denial. In an affidavit of October 27, 1913, received under stipulation as testimony, he says:

"That at the time of the institution of the proceedings by the United States against said Greene, based on the alleged fraudulent transactions referred to in the bill herein, viz. in December, 1899, and on December 14, 1899, when there was deposited with him certain securities, deponent had no knowledge of the sources from which said securities were acquired, other than the fact that they were turned over to deponent by said Greene as the owner thereof. That said securities were received by deponent in absolute good faith, and without suspicion or notice of any flaw or taint in their title, or of any fraud in their acquisition, or of any adverse claim whatsoever. * * * That at the time of the receipt of said securities, and during the pendency of the proceedings instituted by the United States, said Greene denied he had been in any way guilty of any fraud in connection with the matters referred to in the complaint, and deponent so believed and now believes."

In this affidavit he further states with some detail the circumstances of his acquaintance and professional employment by Greene, the enterprises and litigation in which Greene was engaged, with other facts tending to show that Greene was a man of standing and importance in the business world and possessed of considerable means. These statements are in no wise contradicted, and they indicate that Kellogg was warranted in assuming without question that the securities turned over to him had been honestly acquired by Greene in business transactions with which the government was not concerned, and that his ownership of the same was free from suspicion. In short, the evidence fails to sustain the government's contention respecting Kellogg's knowledge, and it must therefore be held that he came into possession of the securities in question without reason to suspect that they had been purchased with stolen money.

Accepting the fact that Kellogg acted in good faith in receiving the stock transferred to him, and that his title thereto was untainted by knowledge or suspicion of the frauds committed by Greene, the case here presented, so far as the merits are concerned, comes directly to the question whether the bond of January 20, 1902, which Greene forfeited by failure to appear, and which Leary's estate afterwards had to pay, was signed by Leary "upon the condition and understanding," as alleged in the petition, that the securities held by Kellogg should remain and continue in his hands as indemnity to Leary for signing the last-mentioned bond. The answer to this question depends upon the probative force of the evidence offered in support of the allegation, and that evidence will now be considered. It consists in part of the following letters:

"New York, December 14, 1899.

"James D. Leary, Esq.

"My dear Sir: Captain Benjamin D. Greene has placed in my hands, as indemnity to you for becoming his bondsman in the matter of the United States against Greene, Gaynor, and others now pending in the District Court, three hundred shares of the capital stock of the Delaware, Lackawanna & Western Railroad Company. It is understood that I am to hold these until you are released from the said bond, or in case that your liability should be established, that it is to be applied in payment of your obligation. I am,

"Yours truly, L. Laflin Kellogg."

"New York, May 21st, 1901.

"James D. Leary, Esq.

"My dear Mr. Leary: It will be necessary to renew the bail given by you for Capt. Greene, and for which I hold the security for your protection, on Thursday morning next at 10:30. Will you kindly come to this office for that purpose about 10:15. I am very sorry to trouble you but it cannot be helped. This new bond is to take the place of the old one without additional liability.

"Yours truly, L. Láflin Kellogg."

"New York, June 6th, 1901.

"James D. Leary, Esq.

"My dear Mr. Leary: I am obliged to trouble you again to renew the bond in the Greene and Gaynor matter. I will have to trouble you to be in court between ten and half past ten Saturday morning. The reason for the matter is not that you have to incur any additional liability, but simply to enable them to carry their case to the United States Supreme Court. All the parties and all the other bondsmen will be on hand before Judge Lacombe by a special arrangement (as the judge is going away) on Saturday morning at half past ten. Please let me hear from you to-day as the matter is most important. With kindest regards, and hoping that you did not suffer from your misstep in the office, I am,

"Yours very truly, L. Laflin Kellogg."

In the original answer of Kellogg, verified March 1, 1904, which was also to be treated as an affidavit, the following allegations appear:

"That at the time of the arrest of said Benjamin D. Greene in December, 1899, he was held to bail in the sum of $25,000. That a friend and client of defendant, one Leary, became surety on the bond for his appearance before the commissioner in the sum of $25,000, on defendant's giving to said Leary a written guaranty to hold him (Leary) harmless from loss or damage by reason of his becoming surety for said Greene. That at about that time said Greene deposited with defendant some securities for the purpose of indemnifying defendant against loss by reason of having indemnified said Leary, with the understanding that at any time he desired he might withdraw the securities so deposited and dispose of them, substituting others in their place. That the securities so deposited were also to be held by the respondent to secure him for the fees and disbursements that might be incurred by him, or his firm, in defending said Greene, or in caring for his interests in any proceedings brought by the United States against him, or in any other matters; there being several matters of litigation, in which said Greene was interested, pending in the respondent's office. That from time to time the securities so deposited were withdrawn by Greene, and others substituted in their place, and that the Norfolk & Western stock, now in defendant's hands, are securities that the defendant deposited or substituted in place of those originally deposited, and the respondent now avers that he holds said Norfolk & Western stock as a bona fide holder, as security for the obligation that he is under to the said Leary by reason of his having become surety on said bond, or by reason of the said Leary having gone upon another bond for the sum of $40,000 for Greene's appearance in the state of Georgia after the conclusion of the said removal proceedings; the agreement to indemnify Leary having been extended to cover said last-mentioned bonds, and also to secure

the payment to the respondent, and to his firm, of the various sums of money that he has advanced and for services rendered for said Greene in various matters since that time."

If the amended answer of Kellogg, verified October 3, 1913, by omission or statement, appears to be at variance in any respect with the allegations above quoted, it is sufficient to say that this answer was allowed to be filed only against the United States, and not as against Mrs. Leary. It may be observed, however, that the amended answer sets up no claim of existing indebtedness against Greene for the payment of which the Norfolk & Western stock is held. Indeed, it is inferable from the record, as we understand it, that Kellogg does not now assert any personal claim to the fund in litigation, except perhaps for such sum as he may ask to have allowed for counsel fees and expenses in protecting the trust.

The foregoing is in substance the proof which Mrs. Leary makes of her right to the stock in question as against the United States. Does it show with sufficient certainty an agreement to protect Leary from liability on the forfeited bail bond, and is the Norfolk & Western stock the indemnity fund contemplated by the parties? We are of opinion that these questions should be answered in the affirmative. That some contract was made for the protection of Leary can hardly be denied. The Kellogg letter of December 14, 1899, admits of no other explanation. It shows that a specified security was placed by Greene in the hands of Kellogg for the express purpose of indemnifying Leary against liability as Greene's bondsman in the matter therein mentioned, namely, "the matter of the United States against Greene." True, it says that the stock described is to be held "until you are released from the *said* bond," which was the bond that day executed. But, in view of what followed, is it not quite unreasonable to suppose that these words expressed the full intent and purpose for which the stock was placed in Kellogg's hands? Plainly the "matter" referred to was the removal of Greene from New York, where he was arrested, to the Southern district of Georgia, to answer an indictment there found against him; and it is undeniable that all the bonds signed by Leary, including the one forfeited, were given at various stages of the removal proceedings, and that all of them had reference to his appearance for trial in the district where he was indicted. They were different parts, so to speak, of a single transaction. It is therefore difficult to believe that the indemnity promise was intended to be limited to the first obligation. Kellogg evidently had no such understanding when he wrote Leary on the 21st of May, 1901, more than five months later, that it would be necessary for him "to *renew* the bail given by you for Captain Greene, and for which I hold the security for your protection," and closed his letter by saying, "This new bond is to take the place of the old one without additional liability." This is a clear declaration that the security he held would cover the renewed obligation, and we do not see that anything else can be made of it.

In the letter of June 6, 1901, when occasion arose for another bond, Kellogg writes, "I am obliged to trouble you again to *renew* the bond

in the Greene and Gaynor matter," and goes on to assure Leary that he will not thereby incur any increase of liability. But this assurance necessarily involved the assertion that the stock in his hands would be held for Leary's security. It is true that no letter is produced which refers specifically to the defaulted bond of January 20, 1902; but Kellogg's answer, barely two years later, quoted from above, avers in substance that the "agreement" to indemnify Leary was extended to cover the $40,000 bond given for Greene's appearance in Georgia after the conclusion of the removal proceedings, and this averment finds strong support in the situation then existing and the previous relations of the parties. Indeed, it is not to be supposed that Leary, who required security before signing the initial bond, would have been willing to incur increased liability on the final bond without provision for his protection. The probabilities all point in the opposite direction.

That the promise to indemnify Leary covered his last obligation is further indicated by the fact, not otherwise explained, that the Norfolk & Western stock has continued to remain in Kellogg's hands, although it appears that other securities were long ago returned to Greene and all transactions between them concluded. And in this connection it may be noted that Kellogg on this appeal assigns error in the decision of the court below, awarding the stock to the United States, "because the said securities had been deposited under an agreement that they should be held by the defendant Kellogg as indemnity for loss by reason of James D. Leary becoming bail for said Benjamin D. Greene, and thereby an equitable lien was created thereon in favor of the defendant Kellogg as trustee for the benefit of the Leary estate."

It seems evident that Greene could not be heard to say, after the continuing force of the indemnity promise had been twice recognized, that it was not intended to cover the last obligation assumed, merely because Leary did not get another written assurance that the stock in Kellogg's hands was held for his protection. And we are of opinion that the United States has no better standing than Greene to deny the continuing force of an agreement to which it was not a party, and as to which Leary had no reason to suppose when it was made that the United States had or could have the slightest interest.

Nor does it appear to us doubtful that the Norfolk & Western stock, which stands in the name of Kellogg, constitutes the trust fund from which Leary's estate may claim reimbursement. Kellogg says that Greene reserved the right to exchange the securities he transferred, and that the Norfolk & Western stock was in fact substituted for the Delaware, Lackawanna & Western stock originally deposited. If the stock first placed in Kellogg's hands was impressed with a trust in favor of Leary, the stock that replaced it became impressed with the same trust when the substitution took place, because it was then set apart and pledged for the protection of Leary.

Of the contention that Mrs. Leary's claim rests wholly upon an implied promise the Supreme Court said:

"We lay on one side the suggestion that the intervention goes only upon an implied contract in its proper sense of an obligation raised by the law irrespective of any real promise. That would seem to us a perverted interpretation of the words 'upon the understanding and condition,' even if the contract were only a general one to indemnify; but a contract that certain specific stock in the hands of a trustee should be held as security for a specific contingent claim could not exist unless it was express. It would be none the less express if it was conveyed by acts importing it than if it was stated in words."

The case presented by the record is surely not wanting in proof of a "real promise." Kellogg's letter of December 14, 1899, says in so many words that Greene had placed 300 shares of Delaware, Lackawanna & Western stock in his hands to indemnify Leary as bondsman for Greene, and this of itself is ample evidence of an express contract. The only subject of question is the scope and extent of the contract actually made. That it covered the bond of January 20, 1902, and was so intended, seems established with reasonable certainty by the written declarations of Kellogg, by the nature of the situation in which the parties were placed, and by the unmistakable import of their acts.

We are therefore constrained to hold, taking all the facts and circumstances into account, that the stock which Greene turned over to Kellogg was intended to be a continuing security for the protection of Leary as the bondsman of Greene in the removal proceedings, and that it constituted an indemnity fund, not only for the prior bonds which were exonerated, but for the final obligation under which his estate has been compelled to pay the judgment in favor of the United States.

The objection that Greene was not made a party to the intervention needs but a word of comment. The record shows that Greene had actual notice of the proceeding by the personal service upon him of a copy of the petition and proposed bill of intervention, with a copy of the order of the court citing him to show cause "against the granting of leave to file said petition and the granting of the prayers of said petition"; and this order stated that "such service of copies shall be sufficient service to entitle the court to proceed herein and to adjudicate upon the filing of said petition and the prayers thereof." The amended petition differs from the original in no material respect so far as Greene is concerned; and he cannot be heard to complain because he was not notified of the amended intervention. Moreover, Greene had long before suffered default, and the government had taken a pro confesso decree against him. This operated to divest him of any interest in the stock, certainly as against the United States, and it is only in a technical sense that he can be said to be a necessary party to the intervention. The contest here is between Leary's estate and the government, and the government is protected from Greene by the pro confesso decree, whether the estate wins or loses. We are not disposed to sustain an objection which apparently was not made on the former appeal, either in this court or the Supreme Court, and which in no aspect of the case is of any practical importance.

For the reasons above stated, we are of opinion that the estate of

Leary has established a claim to the stock in question which is superior to the claim of the United States, and it follows that the decree appealed from must be reversed.