**INTERSTATE COMMERCE COMMISSION, Plaintiff,**

v.

**SOUTHERN RAILWAY COMPANY and Central of Georgia Railroad Company, Defendants.**

**Civ. A. No. 74-9-VAL.**

United States District Court,
M. D. Georgia,
Valdosta Division.

Aug. 15, 1974.

Daniel S. Linhardt, Washington, D. C., for plaintiff.

E. Edward Bruce, Covington & Burling, Washington, D. C.; William H. Teasley, Washington, D. C., Ellsworth H. Hall, Jr., Macon, Ga., for defendants.

J. Reese Franklin, Nashville, Ga., for Nashville Milling Co.

James M. Collier, Dawson, Ga., for Walter Calvin Lee.

C. Nathan Davis, Asst. U. S. Atty., Macon, Ga., for United States.

## OPINION AND ORDER

ELLIOTT, Chief Judge:

In this action the Interstate Commerce Commission ("ICC"), through its Bureau of Enforcement, has filed a complaint to enjoin alleged violations by Southern Railway Company and Central of Georgia Railroad Company ("Southern" and "Central Railroad" individually; "Defendants" collectively), of certain orders of the ICC. The ICC has also filed a motion for a preliminary injunction. Southern and Central Railroad have responded not only by opposing the ICC's motion for preliminary relief, but also by filing motions to dismiss the ICC's complaint under F.R.Civ. P. 12(c). In addition, two shippers, Nashville Milling Company and Mr. Walter Calvin Lee, who claim to be adversely affected by the Defendants' alleged violations of the ICC's orders, have each filed motions to intervene as plaintiffs in this action under F.R.Civ.P. 24 (b) and to add the United States as an additional defendant under 28 U.S.C. § 2322. According to their proposed complaints Nashville Milling Company and Mr. Lee seek damages as well as equitable relief in this action. Southern and Central Railroad have opposed the motions to intervene, and the United States Attorney for the Middle District of Georgia has filed a "Responsive Pleading of the United States of America" in answer to the motions to add the United States as an additional defendant.

The original parties to this action and the applicants to intervene have fully briefed each of these motions, and have filed numerous affidavits in support of their respective positions as to the motion for a preliminary injunction in this action. In addition, on July 22, 1974, the Court heard oral argument on the various motions and also received extensive evidence from two witnesses called by the ICC and from four witnesses called by the Defendants. At that time the Court reserved its ruling on all pending motions, although the Court did allow counsel for the two shippers to participate fully in the hearing. The Court is now therefore in position to consider and enter judgment upon each of the motions presently pending.

## I.

A brief review of factual background to this action is necessary in order to place in perspective the various motions to be considered.

On December 5, 1962, the ICC, pursuant to Section 5(2) of the Interstate Commerce Act, 49 U.S.C. § 5(2), granted Southern permission to acquire control of the Central of Georgia Railway Company ("Central Railway"), subject to conditions essentially identical to those first imposed by the ICC in Detroit, T. & I. R. Co. Control, 275 I.C.C. 455, 488 (1950) (hereinafter referred to as the "DT&I conditions"). The conditions imposed in the ICC's December 5, 1962, order are as follows:

"1. Upon consummation of control of the Central of Georgia Railway Company, by Southern Railway Company, Central of Georgia Railway Company and its subsidiaries shall maintain and keep open all routes and channels of trade by existing junctions and gateways, unless and until otherwise authorized by the Commission.

"2. The present neutrality of handling traffic inbound and outbound by Central of Georgia Railway Company and its subsidiaries shall be continued so as to permit equal opportunity for service to and from all lines reaching the rails of those carriers without discrimination as to the route or the movement of traffic, and without discrimination in the arrangement of schedules or otherwise.

"3. The present traffic and operating relationships existing between the Central of Georgia Railway Company and the subsidiaries on the one hand, and all lines connecting with its tracks, on the other, shall be continued insofar as such matters are within the control of the applicant.

"4. Central of Georgia Railway Company and its subsidiaries shall accept, handle, and deliver all cars inbound and outbound, loaded and empty, without discrimination in promptness or frequency of service as between cars destined to or received from competing carriers and irrespective of destination or route of movement.

"5. Applicant shall not do anything to restrain or curtail the right of industries located on the Central of Georgia Railway Company and its subsidiaries to route traffic over any and all existing routes and gateways.

"6. Any party or any person having an interest in the subject matter may at any future time make application for such modification of the above conditions, or any of them, as may be required in the public interest, and jurisdiction should be retained to reopen the proceeding on our own motion for the same purpose."

Southern Ry. Co.—Control—Central of Georgia Ry. Co., 317 I.C.C. 557, 584 (1962).[1]

Then by order entered on March 29, 1963, the ICC approved Southern's acquisition, through various subsidiaries, of the Georgia & Florida Railroad Company ("G&F"). This order, too, was made subject to the standard DT&I conditions. Georgia & F. Ry. Co.—Acquisition—Georgia & F.R., 317 I.C.C. 745, 754 (1963).

Finally, on January 29, 1971, the ICC authorized Central Railroad, a then newly formed subsidiary of Southern, to consolidate Central Railway, G&F, and other railroads in what was a purely intracorporate transaction. In so doing, the ICC reimposed on the newly formed Central Railroad the standard DT&I conditions to which its predecessor entities had been subject. Central of Georgia Ry. Co.—Consolidation—Central of Georgia R. Co., 338 I.C.C. 353, 378–79 (1971).

---

1. Since the ICC makes no contention that there is any legal difference in the three sets of standard DT&I conditions upon which it relies in this action, it is unnecessary to set forth in full here all three sets of those conditions and no effort will be made to distinguish between those three sets in the course of this opinion.

The ICC complains in this action that certain alleged practices of the Defendants in 1972–74 violate the standard DT&I conditions as imposed on Defendants by each of these orders. Specifically, the ICC alleges that prior to 1962 or 1963 when Southern acquired Central Railway and G&F or at least prior to 1971 when the intracorporate consolidation was effected, certain shippers located in South Georgia—including the applicants to intervene—had shipped grain in covered hopper cars via Central Railway and G&F to points in Florida located on what is now the Seaboard Coast Line Railroad ("SCL") without any limitations being imposed concerning the number of covered hopper cars which could be obtained for such shipments. Since 1972, however, Southern and Central Railroad have at times—according to the ICC—refused to furnish covered hopper cars to shippers on the lines of the former Central Railway and the former G&F for shipments of grain destined to points in Florida on SCL except on the condition that SCL provide a proportionate share of those cars consistent with its share of the joint line-haul revenues generated by these shipments.[2]

The ICC makes no allegation that Defendants have at any time refused to supply boxcars for off-line grain shipments, nor does it allege that South Georgia—Florida grain shipment routes have actually been closed. The ICC and the applicants to intervene have argued before the Court, however, that the shippers on the lines of the former Central Railway and the former G&F are equipped to load only covered hopper cars and that the consignees in Florida generally are not equipped to unload boxcars. They have also contended that it is more difficult for South Georgia grain brokers and the like to ship grain to Florida under Southern's present policy. Thus, the ICC's ultimate allegation here is that the Defendants' refusal at times to supply the shippers on the lines of the former Central Railway and the former G&F with covered hopper cars for off-line grain shipments to Florida has forced diversion of such shipments to destinations on Southern and Central Railroad where the price of grain is allegedly less than the price at SCL Florida destinations.

These alleged practices of Defendants are claimed to be violative of the standard DT&I conditions as imposed in the three orders of the ICC to which Defendants are subject. This is the exclusive basis for both the ICC's complaint for injunctive relief and for the proposed complaints of the applicants to intervene. In terms of relief, the ICC's complaint prays that the Court order Defendants to supply all shippers on the lines of the former Central Railway and the former G&F Railway with covered hopper cars "in the proportion that they are supplied to other Southern shippers regardless of the destination of shipments."

It is against this background that the motions which are now before the Court must be decided.

## II.

First, as to Defendants' motion to dismiss this action under F.R.Civ.P. 12(b)(6), the basis for this motion is, quite simply, the contention that the ICC is without authority to institute this action in its own name as it has sought to do. Defendants' argument is based on the provisions of Chapter 157 of Title 28 of the U. S. Code that set forth procedures governing enforcement of ICC orders, which like those at issue here do not involve the payment of money. In response to Defendants' motion to dismiss, the ICC asserts that its cause of action arises under both Section 16(12) and Section 5(8) of the Inter-

---

2. While this condition on the furnishing of covered hopper cars by Defendants is not specifically alleged in the ICC's complaint, it was fully discussed in that ICC's memorandum in support of its motion for a prelimi-

nary injunction and the parties do not appear to dispute that this has been the policy under which Defendants have at times operated since 1972.

state Commerce Act, 49 U.S.C. §§ 16(12), 5(8),[3] and it argues that those sections grant it the requisite authority to institute this action notwithstanding the provisions of Chapter 157.

In the first place, the language of Chapter 157 of Title 28 stands squarely against the ICC's claim here. The first provision of Chapter 157, 28 U.S.C. § 2321, provides:

> "The procedure in the district courts in actions to enforce . . . in whole or in part any order of the Interstate Commerce Commission other than for the payment of money or the collection of fines, penalties and forfeitures, shall be as provided in this chapter [157]."

The next section, 28 U.S.C. § 2322, then states:

> "All actions specified in section 2321 of this title shall be brought by or against the United States."

And the first paragraph of 28 U.S.C. § 2323 provides in pertinent part:

> "The Attorney General shall represent the Government in the actions specified in section 2321 of this title . . . ."

Finally, the second paragraph of Section 2323 goes on to provide that the ICC or affected parties "may appear as parties of their own motion and as of right" in Chapter 157 actions.

■ To the Court, the effect of these provisions is clear. All suits to enforce an ICC order other than for the pay-

ment of money must be brought by or against the United States. Since the ICC does not even argue that it could name the United States as a defendant in an enforcement action initiated by it, this means all Government-initiated enforcement actions must be brought by the United States under the control of the Attorney General. The ICC's role in such proceedings is limited to an appearance on "motion and as of right"—*i. e.,* by intervention.

The ICC argues, however, that these provisions were intended to entrust *only* the *defense of ICC orders* to the Attorney General, not to preclude the ICC from instituting an action to enforce its own orders under Sections 16(12) and 5 (8). This view finds no support in either the language or the legislative history of the provisions of Chapter 157 or of Sections 16(12) or 5(8).

The ICC's suggested construction would require the Court to ignore the express language of Section 2322.[4] Moreover, such a construction of that section is not compelled by the provisions of the Interstate Commerce Act upon which the ICC relies. Section 5(8) provides only that district courts "shall have jurisdiction upon the complaint of" the ICC to enjoin violations of ICC orders.[5] And Section 16(12) provides that the ICC or an interested party or the United States "may apply to— any district court . . . of competent jurisdiction for the enforcement of" an ICC order other than for the payment of money.[6] These provisions are

---

3. Jurisdiction is alleged under 28 U.S.C. §§ 1336 and 1337.

4. The ICC's construction of those provisions is also plainly inconsistent with the language of the last paragraph of 28 U.S.C. § 2323 which provides that "[t]he Attorney General shall not dispose of or *discontinue* [the] action over the objection of . . . part[ies] [appearing as of right] or [any] intervenor, who may prosecute, defend, or *continue* said action or proceeding unaffected by the action or nonaction of the Attorney General therein." (Emphasis added.) Clearly, only a plaintiff can "discontinue" an action.

5. Section 5(8) provides in full:
   "The district courts of the United States shall have jurisdiction upon the complaint of the Commission, alleging a violation of any of the provisions of this section and disobedience of any order issued by the Commission thereunder by any person, to issue such writs of injunction or other proper process, mandatory or otherwise, as may be necessary to restrain such person from violation of such provision or to compel obedience to such order."

6. Section 16(12) provides, in relevant part:
   "If any carrier fails or neglects to obey

perfectly consistent with the intervenor's role contemplated for the ICC by the second paragraph of Section 2323; intervenors, of course, file "complaints" and "apply" for relief.

The legislative history underlying the provisions of Chapter 157 provides no support for the ICC's claim that the provisions of the chapter do not mean what they say. Since it was first enacted in 1887 the Interstate Commerce Act has contained a version of the present Section 16(12) authorizing the ICC to apply to the federal court to enforce its orders.[7] In 1910, however, the procedural provisions now contained in Chapter 157 were enacted as part of the Commerce Court Act.[8] That Act, among other things, created a Commerce Court with exclusive jurisdiction over "[a]ll cases for the enforcement . . . of any order of the Interstate Commerce Commission other than for the payment of money." Prior to 1910 the ICC had regularly instituted Section 16 judicial proceedings in its own name to enforce its own orders,[9] but in Section 4 of the Commerce Court Act, the precursor of Section 2322, Congress provided:

> "That all cases and proceedings in the commerce court *which but for this Act would be brought by or against the Interstate Commerce Commission* shall be brought by or against the United States . . . ." (Emphasis added.)[10]

Under Section 4, then, Congress directed, in effect, that the ICC would no longer be allowed to bring actions to enforce orders in its own name. Moreover, Congress desired to lodge initial responsibility and control with respect to Government-enforcement actions in the Attorney General and thus Section 5 of the Commerce Court Act, which is now contained in 28 U.S.C. § 2323, further provided in part:

> "That the Attorney General shall have charge and control of the interests of the Government in all cases and proceedings in the commerce court . . . ."

Notwithstanding the contentions of the ICC, the legislative debates underlying Sections 4 and 5 leave no doubt that Congress' intent was to give the Attorney General initial control of *all* Government litigation with respect to ICC orders within Section 16(12). For example, Representative Madden, in the course of explaining during those debates the reasons for lodging responsibility in the Attorney General, pointed out the proposed restructuring of responsibility within the Government for litigation concerning ICC orders would eliminate the appearance of impropriety inherent in the then-existing administrative scheme:

> "[F]irst, investigating in preparation for prosecution; then assuming a judicial relation in the same case; and

---

any order of the commission other than for the payment of money, while the same is in effect, the Interstate Commerce Commission or any party injured thereby, or the United States, by its Attorney General, may apply to any district court of the United States of competent jurisdiction for the enforcement of such order."

7. See Act of Feb. 4, 1887, ch. 104, § 16, 24 Stat. 384–385.

8. Act of June 18, 1910, ch. 309, 36 Stat. 539.

9. See, *e. g.*, Texas & P. Ry. v. ICC, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1896); ICC v. Southern Pac. Ry., 123 F. 597 (S.D. Calif.1903).

10. Section 2322 no longer contains the clause "which but for this Act would be brought by

or against the Interstate Commerce Commission" that is to be found in the original provision, Section 4 of the Commerce Court Act. The deletion of this clause came about as a result of 1948 modifications of the Section. That change in the Section was, however, without substantive significance. The revisor's note specifically indicates that Section 2322 was derived directly from earlier versions of the Section. The revisor's note contains no indication whatsoever that the deletion of the clause was intended to effectuate any substantive change in the meaning of the statute and therefore none is to be inferred. *See* United States v. Ryder, 110 U.S. 729, 740, 4 S.Ct. 196, 28 L.Ed. 308 (1884); Cass v. United States, 417 U.S. 72, 94 S.Ct. 2167, 2173, 40 L.Ed.2d 668 (1974).

finally [the ICC] *becomes plaintiff or defendant*, as the case may be, in courts, all with reference to the same subject-matter.

"It is not necessary to impeach the integrity or good faith of the commission in order to see the impropriety of this." 45 Cong.Rec. 4939 (April 18, 1910). (Emphasis added.) [11]

In addition, the Representative emphasized the significance of the underlying considerations of uniformity, particularly with respect to the establishment of "a harmonious, consistent and justly proportioned system of laws, rules and regulations, governing interstate commerce in all its branches and phases." [12] *Id.* Obviously, these considerations of separation of responsibility and uniformity of administration with respect to all laws governing interstate commerce apply with same—if not more—force to suits to enforce ICC orders as they do to suits to review ICC orders.[13] In short, it is simply impossible to ignore the plain import of the explanation provided to the House by Representative Mann, one of the Managers of the Commerce Court Act, with respect to the effect of Sections 4 and 5:

"We have provided in the bill that the litigation shall be in the name of the United States, not in the name of the Commission. That it shall be under the control of the law office of the Government, the Attorney General, so far as representing the interests of the United States are concerned." 45 Cong.Rec. 4574. (April 12, 1910) [14]

Moreover, in 1910 Congress specifically addressed itself to the problem of reconciling Section 16(12) with the procedural limitations now contained in Chapter 157. Thus Congress deleted from the version of Section 16 then in effect that portion which provided that the ICC could apply for enforcement of its orders "in its own name." [15] Senator Elkins explained, in presenting to the Senate the report of the Senate and House Conferees, that this and other amendments to Section 16 of the Interstate Commerce Act were "necessary to make the provisions relating to the enforcement of orders of the Commission in harmony with the changed procedure of the establishment of the commerce court," 45 Cong.Rec. 8239 (June 16, 1910). In other words, Congress amended the precursor of Section 16(12) to remove any doubt that henceforth the ICC was without authority to initiate judicial enforcement proceedings under Section 16 in its own name and that

11. *See also* 45 Cong.Rec. 5515 (April 28, 1910) (Rep. Townsend).

12. *See also* 45 Cong.Rec. 5517 (April 28, 1910) (Rep. Townsend).

13. As to the House of Representatives, *see also* 45 Cong.Rec. 4574 (April 12, 1910); *id.* 4831–39 (April 16, 1910); *id.* 5514–37 (April 28, 1910). As to the Senate, *see also* 45 Cong.Rec. 6396 (May 17, 1910); *id.* 6406–09 (May 17, 1910); *id.* 6447 (May 18, 1917). *See also* 45 Cong.Rec. 5515 (April 28, 1910) (Rep. Townsend); *id.* 5517 (April 28, 1910) (Rep. Townsend); *id.* 5518 (April 28, 1910) (Rep. Bartlett); *id.* 5522 (April 28, 1910) (Rep. Poindexter).

14. *See also* H.R.Rep.No.923, 61st Cong.2d Sess. 8 (1910); 45 Cong.Rec. 5516 (April 28, 1910) (Rep. Townsend); 45 Cong.Rec. 6408 (May 17, 1910) (Senator Rayner); 45 Cong.Rec. 6447 (May 18, 1910) (Senator Rayner).

15. The relevant portion of the version of Section 16 which was in effect immediately prior to the 1910 amendment read as follows:

"If any carrier fails or neglects to obey any order of the Commission, other than for the payment of money, while the same is in effect, any party injured thereby, or *the Commission in its own name*, may apply to the circuit court in the district where such carrier has its principal operating office, or in which the violation or disobedience of such order shall happen, for an enforcement of such order." Act of June 29, 1906, ch. 3591, § 5, 34 Stat. 591. (Emphasis added.)

As amended in 1910, the relevant portion of Section 16 provided:

"If any carrier fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Interstate Commerce Commission or any party injured thereby, or the United States, by its Attorney-General, may apply to the commerce court for enforcement of such order." Act of June 18, 1910, ch. 309, § 13, 36 Stat. 555.

Government initiation of such proceedings is governed by the provisions which are today contained in Chapter 157. Thus, Section 16(12) does not aid the ICC in its efforts here to escape the requirements of Chapter 157.

Nor does the ICC fare any better insofar as it relies upon Section 5(8) as an alternative basis for its authority to bring this action. Section 5(8) was added to the Interstate Commerce Act by the Emergency Railroad Transportation Act of 1933.[16] By the time of the enactment of Section 5(8) the procedural limitations contained in Chapter 157 with respect to Government initiation of judicial proceedings *to enforce* ICC orders had been in effect for twenty-three years. Congress, however, made no overt effort in enacting the 1933 Act to reconcile those procedural limitations and Section 5(8). That task Congress has left to the courts.

The ICC does not deny that the procedural provisions of Chapter 157—having, as they do, general applicability to all "actions to enforce . . . in whole or in part any order of the Interstate Commerce Commission other than for the payment of money," 28 U.S.C. § 2321—have never been tied by their terms to any particular substantive provision of the Interstate Commerce Act. Nevertheless, the ICC contends, in effect, that Congress, albeit *sub silentio*, intended to carve out an exception to those procedural limitations on Government enforcement suits in enacting Section 5(8) and thereby to allow the ICC to institute suits in its own name to enforce orders made under Section 5. The Court finds this claim of implied repeal completely untenable.

As the Supreme Court has explained:

"It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible . . . The intention of the legislature to repeal 'must be clear and manifest' . . . ." United States v. Borden, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939).[17]

The ICC has pointed to nothing in the 1933 Act that reveals *any* suggestion whatsoever that Congress, in enacting Section 5(8), intended to effect an implied repeal of the provisions now contained in Chapter 157. It appears that the effect of Section 5(8) went completely undiscussed in the Senate and House debates of the 1933 Act. Furthermore, the Senate and House Reports which accompany the 1933 Act provide only the following obscure explanation of the provision's purpose:

"Since the bill makes no provision for criminal penalties in case of violation of the [other] provisions [of Section 5], this paragraph [Section 5(8)] furnishes a means for the enforcement of such provisions and of orders of the Commission in cases where the Commission finds that the provisions are being violated or that its orders are being disobeyed. It authorizes the district courts of the United States to issue such writs of injunction or other proper process, mandatory or otherwise, as may be necessary to restrain violations or to compel obedience to orders." S.Rep.No.87, 73D Cong., 1st Sess. 10 (1933); H.R.Rep. 193, 73d Cong., 1st Sess. 18 (1933).

This explanation hardly provides the requisite clear expression of congressional intent that the ICC was to have authority to *initiate* judicial proceedings to enforce Section 5 orders in spite of the procedural limitations now contained in Chapter 157. Indeed, there is nothing in either this explanation or the language itself of Section 5(8) which is inconsistent with the construction of the Section that, like Section 16(12), it per-

---

16. Act of June 16, 1933, ch. 91, 48 Stat. 211.

17. *See also* Lynch v. Household Finance Corp., 405 U.S. 538, 549, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); Posadas v. National City Bank, 296 U.S. 497, 504, 56 S.Ct. 349, 80 L.Ed. 351 (1936).

tains only to the ICC's substantive authority to obtain relief upon its complaint *as an intervenor* in enforcement proceedings initiated in accordance with the procedures of Chapter 157.[18] Finally, the Court cannot ignore the completely unprecedented nature of the ICC's action here. The ICC has been unable to cite to the Court a single instance since the provisions of Chapter 157 were first enacted in 1910 in which the ICC has instituted an action in its own name under Sections 16(12) or 5(8).[19] Indeed, the ICC itself has acknowledged in its briefs here that "there is no record of a contested action brought by the Commission under Section 16(12) in over 70 years".

In summary, then, the Court concludes that the ICC is without the necessary statutory authority to institute this action in its own name under either Section 16(12) or Section 5(8) of the Interstate Commerce Act. Under the provisions of Chapter 157 a suit such as the present one must be initiated by the United States as represented by the Attorney General. Consequently, the Defendants' motion under F.R.Civ.P. 12(b)(6) must be granted and the ICC's complaint must be ordered dismissed.

The Court believes it clear that this conclusion is in no way affected by the pendency of the motions to intervene or the motions to add the United States as an additional defendant in this action. The complaint of the ICC must stand on its own with respect to the motion to dismiss; it is elementary that jurisdictional defects in the original complaint cannot be remedied by the papers of intervenors, nor can authority to bring a suit be bestowed by intervenors on an original plaintiff where no such

---

18. The ICC attempts to draw support for its construction of both Section 5(8) and Section 16(12) from enforcement provisions contained in Parts II, III and IV of the Interstate Commerce Act which deal with carriers other than railroads. See 49 U.S.C. § 322(b) (motor carriers); 49 U.S.C. § 916(b) (water carriers); 49 U.S.C. § 1017(b) (freight forwarders). Whatever the meaning of these provisions which on their face are not significantly different from Sections 16(12) and 5(8), their proper construction is not the issue presently before the Court. Moreover, to the extent that the ICC relies upon legislative history associated with these enforcement provisions, it suffices to note that while such pieces of legislative history may be informative with respect to the meaning of the enforcement provisions to which they specifically pertain, they obviously are not authoritative with respect to the meaning of Section 16(12) or Section 5(8), both of which were enacted by entirely different Congresses prior to when those pieces of legislative history were written. In a comparable situation involving the construction of the Norris-LaGuardia Act, the Supreme Court has said: "We fail to see how the remarks of . . . Senators in 1943 can serve to change the legislative intent of Congress expressed in 1932 . . . ." United States v. United Mine Workers, 330 U.S. 258, 281–282, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947). *See also* Penn Mutual Life Insur. Co. v. Lederer, 252 U.S. 523, 537–538, 40 S.Ct. 397, 402, 64 L.Ed. 698 (1920) ("The legislative

history of an act may, where the meaning of the words used is doubtful, be resorted to as an aid to construction . . . . But no aid could possibly be derived from the legislative history of another act passed nearly six years after the one in question.").

19. Each of the decisions upon which the ICC relies is clearly distinguishable: United States v. City of Jackson, 318 F.2d 1 (5th Cir. 1963), was originally brought by the United States and the ICC was only thereafter added as a plaintiff; United States v. Lassiter, 203 F.Supp. 20 (W.D.La.), aff'd, 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962), was a suit brought by the United States as well as the ICC; Pacific Fruit Express Co. v. Akron, C. & Y. R. R., 355 F.Supp. 700 (N.D.Calif.1973), was brought as a private action in which the ICC ultimately appeared as an intervenor; and, in Railroad Trainmen v. Baltimore & O. R. R., 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947), the ICC again appeared only as an intervenor.

Moreover, in United States v. United States Freight Co., 80 F.Supp. 336, 337 (S.D.N.Y.1947), an action to enforce an ICC order made under Section 5 of the Interstate Commerce Act, suit "was brought by the United States, at the request of the Interstate Commerce Commission, as authorized by 28 U.S.C.A. §§ 41(27) and 48 [now §§ 1336 and 2322 respectively]," with the Attorney General appearing as attorney of record for the United States. This is the procedure which should have been but was not followed in this action.

authority existed prior to intervention. *See, e. g.*, Kendrick v. Kendrick, 16 F.2d 744, 745 (5 Cir. 1926), cert. denied, 273 U.S. 758, 47 S.Ct. 472, 71 L.Ed. 877 (1927) ("An existing suit within the court's jurisdiction is a prerequisite of an intervention, which is an ancillary proceeding in an already instituted suit."); Robertson v. Gallion, 282 F. Supp. 157, 159–160 (M.D.Ala.1968); Hobbs v. Policy Jury of Morehouse Parish, 49 F. F.R.D. 176, 180–181 (W.D.La. 1970). Given the presence of a fatal defect in the ICC's complaint, it is, of course, plain that the complaint must be dismissed, and from this it follows that there remains no action in which Nashville Milling Company and Mr. Lee may intervene. Therefore, their respective motions to intervene and to add the United States as an additional defendant must also be denied.[20] *See, e. g.*, Hofheimer v. McIntee, 179 F.2d 789 (7 Cir. 1950), cert. denied, 340 U.S. 817, 71 S.Ct. 47, 95 L. Ed. 600 (1950); Davis v. Jury Comm., 261 F.Supp. 591, 594 (M.D.Ala.1966).

### III.

The Court's conclusion with respect to Defendants' motion to dismiss is, of course, sufficient to dispose fully of this action. Nevertheless, since the parties have fully briefed and argued Defendants' additional motion for judgment on the pleadings under Rule 12(c), the Court believes it to be in the interest of judicial economy for it also to rule at this time on that additional motion.

As noted, the essence of the ICC's complaint in this action is the alleged failure of Defendants at various times in 1972 through 1974 to supply certain shippers located on the lines of the former Central Railway and the former G&F with all the covered hopper cars which they desired for shipments of grain to destinations in Florida on the line of the SCL. The ICC seeks to cast this alleged failure to supply a particular type of car to particular shippers as a violation by Defendants of the standard DT&I conditions imposed on Defendants by the ICC's prior orders. Consequently, the underlying legal premise of ICC's contentions is that DT&I conditions govern the obligations of the Defendants with respect to the issues of car service raised by the allegations of the ICC's complaint.

Defendants contend, however, that the DT&I conditions have no such application to car service issues. They maintain that such issues are completely outside the intended scope of the standard DT&I conditions and therefore claim that they are entitled, as a matter of law, to judgment on the pleadings and dismissal of the ICC's complaint. The Court is compelled to agree with the Defendants.[21]

At the outset, the Court believes it bears noting that there can be no doubt but that this action is, at its heart, concerned with complex issues of car service. Before entertaining argument on Defendants' motion for judgment on the

20. If the ICC's complaint were able to survive the motion to dismiss under F.R.Civ.P. 12(b)(6), the Court would be compelled to reach a different conclusion with respect to the motions to intervene under F.R.Civ.P. 24(b). Putting aside the ICC's lack of authority to initiate this suit, the Court concludes that the discretionary considerations which underlie permissive intervention clearly require that the motions of Nashville Milling Company and Mr. Lee to intervene be granted and that they be allowed to file their proposed complaints in this action. Consequently, the discussion which is set forth in Part III of this opinion with respect to the sufficiency of the legal basis for the ICC's complaint applies with equal force to the complaints of Nashville Milling Company and Mr. Lee which rest on the same legal basis as the ICC's complaint.

21. While the ICC objected in its briefs that the question raised by Defendants as to the proper construction of the standard DT&I conditions was not a proper subject for a motion under F.R.Civ.P. 12(c), it did not press this point at oral argument on the motion, and the Court, in any case, believes it clear that since the question presents purely a matter of legal construction, it is in fact appropriate for disposition under F.R.Civ.P. 12(c). *See generally* 5 C. Wright & A. Miller, Federal Practice and Procedure § 1367, at 685–86 (1969).

pleadings at the hearing held on July 22, 1974, the Court, in conjunction with the ICC's motion for a preliminary injunction, heard extensive testimony with respect to the merits of this action from witnesses presented by both the ICC and the Defendants. For present purposes it suffices to say that the testimony generally consisted of a detailed exposition of the opposing parties' views of the precise types of car service which the Defendants and certain of their predecessor entities—namely, Central Railway and G&F—have furnished at various points in time from approximately 1961 to the present. While the Court does not propose to make any rulings or findings at this time on the basis of that testimony, the Court did find that testimony to provide a particularly useful background against which to evaluate the legal scope of the standard DT&I conditions in that it demonstrated the complexity and problems of proof inherent in the issues which the ICC seeks to have the Court adjudicate under the DT&I conditions.

Turning first to the language of the conditions themselves, the ICC has relied in this action on only three of six standard DT&I conditions—conditions 1, 3 and 5. As imposed, for instance, in the context of the 1971 consolidation of Central Railway and G&F into Central Railroad, those conditions provided as follows:

"1. That under control by Southern Railway Company, Central of Georgia Railroad Company shall maintain and keep open all routes and channels of trade via existing junctions and gateways, unless and until otherwise authorized by the Interstate Commerce Commission.

". . . .

"3. The present traffic and operating relationships existing between Central of Georgia Railroad Company on the one hand, and all lines connecting with their tracks, on the other,

shall be continued insofar as such matters are within the control of the applicants.

". . . .

. "5. Southern Railway Company shall not do anything to restrain or curtail the right of industries located on Central of Georgia Railroad Company to route traffic over any or all existing routes and gateways.

". . . .

Central of Georgia Ry. Co.–Consolidation–Central of Georgia R.R., 338 I.C.C. 353, 378–79 (1971).

On their face these conditions say nothing about general questions of car service, much less about the furnishing or the distribution of specific types of cars, such as covered hopper cars, to particular shippers. They refer instead only to "routes and channels of trade via existing junctions and gateways," "traffic and operating relationships" and "the right to route traffic over any and all existing routes or gateways."

It is clear from DT&I condition 4 that the ICC knew how to address questions of car service when it wished to do so. Thus, that condition requires a carrier subject to its terms to:

"accept, handle, and deliver all cars . . . without discrimination in promptness or frequency of service as between cars destined to or received from competing carriers and irrespective of destination or route of movement."[22]

This condition has no application in this action, since it deals with a carrier's discrimination between competing carriers with whom it connects. It does, however, indicate that the obligation to "keep open all routes and channels of trade via existing junctions and gateways" and to preserve "traffic and operating relationships" does not include car service obligations, for were questions of discrimination in promptness or frequency of service in the handling of cars

22. *Standard DT&I condition 4 was imposed on the Defendants in the three orders on* which the ICC relies in this action just as were the other five standard conditions.

—that is, questions of car service—subsumed in the general obligations of maintaining routes and channels of trade and the like, there obviously would have been no need to include condition 4 in the standard DT&I conditions.

The conclusion that none of the conditions upon which the ICC relies were intended to govern questions of car service in this action is reinforced by consideration of the explicit provisions of the Interstate Commerce Act which in fact deal with the very problems now before the Court. Section 1(11) of the Act, 49 U.S.C. § 1(11), for example, obligates regulated carriers such as Defendants "to furnish safe and adequate car service . . . ."[23] In addition, Section 1(14), 49 U.S.C. § 1(14), empowers the ICC to make rules and regulations with respect to car service. Finally, Section 3(1), 49 U.S.C. § 3(1), makes it:

"unlawful for any common carrier subject to the provisions of [Chapter 1 of the Interstate Commerce Act] to make, give or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever . . . ."

Without doubt the provisions of Section 1 and Section 3 of the Act give the ICC power to attack the problems of inadequate and discriminatory car supply which are alleged to exist in this case. Indeed, it is interesting to observe that the ICC's argument with respect to the nature of the Defendants' car service obligation under the standard DT&I conditions is replete with reliance on numerous decisions concerning the nature and extent of a carrier's car supply obligation under particularly Section 1 of the Act. *This is not, however, a Section 1 or a Section 3 action.* As a consequence, both these statutory provisions and the ICC's reliance on prior decisions under those provisions ultimately serve only to illustrate the extent to which the ICC's construction of DT&I conditions is at variance with the existing statutory scheme for enforcing obligations with respect to car supply and car distribution.

Thus the ICC does not deny that in proceedings brought under Sections 1 and 3 it bears the burden of proof with respect to the reasonableness and adequacy of the car service afforded by a carrier. Yet in seeking to sweep issues of car supply and car distribution within the scope of the standard DT&I conditions the ICC admittedly attempts to subject carriers to higher standards of car service than are imposed by the provisions of the Act[24] and to compel carriers to apply to it for modification of the standard DT&I conditions—and thereby to shift the burden of proof with respect to the reasonableness of such modifications—before altering their car service practices or policies.[25]

---

23. Section 1(10) of the Act, 49 U.S.C. § 1(10), provides that the "term 'car service' in this chapter shall include the . . . supply . . . distribution, . . . and return . . . of . . . cars . . . used in the transportation of property, including special types of equipment . . . ."

24. Indeed, before the Court the ICC has acknowledged that:
"absent the DT&I conditions, Southern's preunification practice of supplying Cen-

tral Railroad Shippers with cars could, arguably, be terminated or modified without violating Part I of the Act."
Memorandum in Opposition to Defendants' Motion for a Judgment on the Pleadings at 9.

25. The ICC has effectively admitted this to be its purpose here. See Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction at 9. Given that the DT&I conditions are apparently imposed almost as a matter of course in all corpo-

Every prior instance of judicial consideration of the scope of the standard DT&I conditions cited to the Court by the parties clearly indicates that questions of car service are outside the intended scope of the conditions. First, in New York, N. H. & H. R. R. Co. First Mortgage Bondholders' Comm. v. United States, 289 F.Supp. 418, 447 (S.D.N.Y.1968) (three-judge court), the Court explained that "while the standard routing conditions, which have been routinely imposed since Detroit, Toledo & Ironton Control, 275 I.C.C. 455 (1950), require that 'all routes and channels of trade via existing junctions and gateways' be kept open, with neutrality of handling traffic as among connections, *they do not speak to the quality of service afforded.*" (Emphasis added.) Moreover, the Court in that case went on to declare that the conditions then before it gave *"no protection as to schedules affording effective connection with [competing carriers] or many other factors important to maintaining service on a competitive basis."* (Emphasis added.) The ICC's complaint in this action is, of course, directed to only one aspect of "the quality of service afforded" by the Defendants—that is, the furnishing of a particular type of car to particular shippers for use on the relevant routes. Moreover, if the standard DT&I conditions give no protection to the scheduling of service with connecting carriers, *a fortiorari* the distribution of a particular type car which affects the level of service afforded is an operating problem outside the scope of those conditions.

Indeed, the latter point is made plain by the decision in Pittsburgh & L. E. R. R. v. United States, 294 F.Supp. 86, 101 (W.D.Pa.1968), where the Court rejected the contention of certain railroads that in addition to the standard DT&I condition the ICC should have imposed a condition designed to require "maintenance of the existing operating schedules [imposed] for freight trains":

"Maintenance of schedules is an operating problem with multitudinous facets, and the Commission, we believe, wisely avoided injecting such complexities into a Section 5 proceeding."

The detailed evidence which was presented in connection with the motion for a preliminary injunction demonstrated to the Court the extent to which construing DT&I conditions to govern issues of car service would in fact result in similarly injecting the courts into shipper-carrier disputes concerning yet another "operating problem with multitudinous facets." Given that the standard DT&I conditions have been "routinely imposed" in the vast number of railroad acquisitions and consolidations which have been approved since 1950 (New York, N. H. & H. R. R. Co. v. United States, 289 F.Supp. at 447), the potential impact of such a result on the railroads and on the courts can hardly be minimized.

There is, finally, Kansas City So. Ry. v. United States, 288 F.Supp. 742 (W.D.Mo.1968), a decision upon which the ICC in fact placed heavy reliance in support of its construction of the standard DT&I conditions. Relying upon prior administrative decisions of the ICC, the *Kansas City Southern* court did hold that the "commercial closing" of a route via tariff filings and the like violates the standard DT&I conditions. See *288 F.Supp. at 747*. The ICC contends here that Defendants' refusal on occasion to supply shippers on the lines of the former Central Railway and the former G&F has effected such a "commercial closing"

rate acquisitions and consolidations of carriers subject to ICC approval, the Court questions whether the ICC would not ultimately create an administrative nightmare if it were to establish that the conditions governed questions of car service. Under such circumstances, any carrier subject to the conditions would be forced to initiate an administrative proceeding before the ICC every time it wished to make any change whatsoever in the *status quo* which existed with respect to car service at the time the conditions were imposed on it.

of those routes. But the discussion in *Kansas City Southern* of the concept of "commercial closing", as derived from prior ICC decisions, was predicated upon a determination to the effect that " '*no traffic* has moved over the [carrier's] route since the establishment of reduced rates over competitive routes.' " *288 F. Supp. at 747* (emphasis added). There is no allegation in this action that Defendants have unilaterally made it impossible through their car service policies to ship grain over the relevant routes to Florida; on the contrary, so far as appears from the allegations of the ICC, the connecting carrier, SCL, remains free to receive and to send grain shipments in covered hopper cars over the relevant routes if it is willing to provide a proportionate share of covered hopper cars. The routes remain open and the only dispute is between Defendants and SCL as to the extent of their respective obligations to supply covered hopper cars for shipments over those routes.

If anything, *Kansas City Southern* suggests that the car service obligations are not within the purview of the standard DT&I conditions. The *Kansas City Southern* court quoted from an order of the ICC in a prior merger proceeding in which the ICC refused to impose provisions "for the maintenance of service and schedules" in addition to the standard DT&I conditions, pointing out that:

> "[I]t is not practicable, nor would it be in the public interest, to impose conditions calculated to freeze the flow of traffic into a preexisting pattern or to protect competing and connecting carriers against all possible adverse effects which might follow from the unification and resulting improvements in service by the surviving corporation. Such action would prevent, to a substantial extent, the effectuation of service improvements to which the shipping public is entitled, and would unduly restrict the unified company in its solicitation and routing of traffic and the development of a strong competitive system."

288 F.Supp. at 748–749, quoting from Erie R. Merger, 312 I.C.C. 185, 191 (1960).

Adoption of the construction of the standard DT&I conditions now urged by the ICC would effectively "freeze" in perpetuity the car service policies of the Defendants and every other carrier subject to DT&I conditions in precisely the manner rejected by the ICC in *Erie R. Merger*. Since the Court has little doubt that the ICC did not intend so to "freeze" the operating policies of the Defendants in the three orders to which they are subject any more than it intended so to "freeze" the operating policies of the merging railroads in *Erie R. Merger*,[26] the Court must conclude that the standard DT&I conditions, as imposed in those former three orders, do not govern the questions of car service presented by the allegations of the ICC's complaint. For this reason, the Defendants' motion for judgment on the pleadings will be granted and the ICC's complaint dismissed.[27]

### IV.

In view of the foregoing, the Court does hereby adjudge and order as follows:

(1) That the motion of Defendants to dismiss be, and hereby is, granted;

---

26. In assessing the intent of the ICC in the three orders at issue here, sight should not be lost of the fact that the DT&I conditions were imposed in each of the orders essentially with the consent of the Defendants without detailed exploration of their precise effect on the Defendants' operations. Under such circumstances, the Court must question the simple fairness of subjecting Defendants to obligations which certainly were not expressly considered at the times the conditions were imposed and which are, at best, not readily apparent from the language of the conditions themselves.

27. Since the ICC's complaint in this action must be dismissed, the Court has no occasion to rule upon the ICC's motion for a preliminary injunction.

(2) That the motion of Defendants for judgment on the pleadings be, and hereby is, granted;

(3) That the amended complaint of the Interstate Commerce Commission in this action be, and hereby is, dismissed;

(4) That the motions of Nashville Milling Company, Inc. and Mr. Walter Calvin Lee to intervene as plaintiffs be, and hereby are, denied;

(5) That the motions of Nashville Milling Company, Inc. and Mr. Walter Calvin Lee to add the United States of America as an additional defendant be, and hereby are, denied.