**Paolo LO DUCA, Petitioner–Appellant,**

v.

**UNITED STATES of America, Respondent–Appellee.**

**No. 734, Docket 95–2462.**

United States Court of Appeals, Second Circuit.

Argued Feb. 21, 1996.

Decided Aug. 29, 1996.

James W. Shannon, Jr., Washington, D.C.
(Gregory B. Craig, Matthew J. Herrington,
Williams & Connolly, Washington, D.C.;
Judd Burstein, Robert N. Fass, Marc Fer-

nich, New York City, on the brief), for petitioner–appellant.

Scott R. McIntosh, Washington, D.C., Laura A. Ward, Asst. U.S. Atty., Brooklyn, N.Y. (John C. Keeney, Acting Asst. Atty. Gen., Douglas N. Letter, U.S. Dept. of Justice, Washington, D.C.; Zachary W. Carter, U.S. Atty., Emily Berger, Susan Corkery, Asst. U.S. Attys., Brooklyn, N.Y., on the brief), for respondent–appellee.

Before: NEWMAN, Chief Judge, and KEARSE, Circuit Judge, and WEXLER, District Judge.*

JON O. NEWMAN, Chief Judge:

This appeal presents a novel challenge to the constitutionality of the United States extradition statute, 18 U.S.C. § 3184 (1994), which has governed the extradition of fugitives found in this country for nearly 150 years. Petitioner-appellant Paolo Lo Duca appeals from the July 24, 1995, judgment of the United States District Court for the Eastern District of New York (David G. Trager, Judge), dismissing his petition for a writ of habeas corpus. Lo Duca contends primarily that his extradition is unconstitutional because section 3184 violates the doctrine of separation of powers. Because we see no constitutional infirmity in the statute, we affirm the judgment of the District Court.

## Background

In March 1993, Paolo Lo Duca was convicted by the Court of Palermo in Italy for various narcotics-related offenses after being tried *in absentia.* Although Lo Duca, an Italian citizen residing in Sands Point, New York, refused to appear for trial, he was represented by his attorney in all proceedings. The evidence showed that Lo Duca, as a member of the Sicilian Mafia, had conspired to import cocaine from Colombia through the United States to Italy. Lo Duca was sentenced by the Court of Palermo to nineteen years in prison.

The Republic of Italy subsequently submitted an application, in accordance with Article XII of the Italian–American extradition treaty, requesting that the United States provisionally arrest Lo Duca. *See* Extradition Treaty Between the Government of the United States of America and the Government of the Republic of Italy, October 13, 1983, U.S.–Italy, art. XII, T.I.A.S. No. 10837 ("Extradition Treaty"). In May 1994, the Government, acting on behalf of the Republic of Italy, filed a complaint in the Eastern District of New York seeking an arrest warrant for Lo Duca. Then–Magistrate Judge Allyne R. Ross granted the request, and Lo Duca was taken into custody.

The Republic of Italy then made a formal request to extradite Lo Duca pursuant to Article X of the Extradition Treaty. In November 1994, Magistrate Judge Steven M. Gold held a hearing in accordance with 18 U.S.C. § 3184 to review the evidence of criminality and determine whether Lo Duca could be extradited by the Secretary of State. Magistrate Judge Gold examined the appropriate documents required under Article X of the Extradition Treaty, including a text of the relevant Italian laws and a summary of the evidence against Lo Duca. He found probable cause to extradite.

Magistrate Judge Gold also considered a legal challenge to the extradition of Lo Duca for the Italian offense of "association of mafia type." Lo Duca contended that the Italian statute criminalized conduct that was not punishable under the laws of the United States, and therefore failed to meet the dual-criminality requirement of the Extradition Treaty. *See* Extradition Treaty, art. II, T.I.A.S. No. 10837. Magistrate Judge Gold rejected this argument, finding that the offense of "association of mafia type" applied to conspirators who "avail themselves of the power of intimidation and of the condition of subjection and conspiracy of silence deriving therefrom for the purpose of committing crimes." He concluded that the Italian offense was similar to RICO and other conspiracy offenses that are well-recognized in the United States. Magistrate Judge Gold then

---

* Honorable Leonard D. Wexler, of the United States District Court for the Eastern District of New York, sitting by designation.

certified Lo Duca to the Secretary of State for extradition.

Lo Duca subsequently sought a writ of habeas corpus from the District Court arguing (1) that the documents submitted to the extradition officer were insufficient to comply with Article X of the Extradition Treaty, and (2) that the Italian offense of "association of mafia type" failed to meet the dual-criminality requirement. Judge Trager denied his petition for a writ of habeas corpus. Lo Duca now appeals.

### Discussion

### I. The Constitutionality of 18 U.S.C. § 3184 [1]

The federal extradition statute, 18 U.S.C. § 3184, was first enacted nearly 150 years ago to provide a legal framework for extradition proceedings involving fugitives found in the United States. Prior to 1848, extradition was largely a matter committed to the discretion of the Executive Branch. *See Austin v. Healey*, 5 F.3d 598, 604 (2d Cir.1993) ("Congress reacted, in part, to 'the public clamor for judicial involvement in the extradition process.'") (quoting Jacques Semmelman, *Federal Courts, The Constitution, and the Rule of Non–Inquiry in International Extradition Proceedings*, 76 Cornell L.Rev. 1198, 1208 (1991)), *cert. denied*, 510 U.S. 1165, 114 S.Ct. 1192, 127 L.Ed.2d 542 (1994). The primary function of section 3184 is to "interpos[e] the judiciary between the executive and the individual." *Id.* [2] To that end, the extradition statute requires the Government to submit a formal complaint setting forth the legal and factual bases for extradition. The complaint must be brought before an extradition officer—"any justice or judge of the United States, or any magistrate authorized ... by a court of the United States, or any judge of a court of record of general jurisdiction of any State...." 18 U.S.C. § 3184. The extradition officer is then directed to hear and consider the "evidence of criminality." *Id.* If the evidence is sufficient "to sustain the charge under the provisions of the proper treaty or convention," the extradition officer is instructed to issue a certificate of extraditability to the Secretary of State. *Id.* At that point, the Secretary of State has final authority to extradite the fugitive, but is not required to do so. Pursuant to its authority to conduct foreign affairs,

---

1. At the outset, Lo Duca argues that this Court is bound by Judge Lamberth's decision in *Lobue v. Christopher*, 893 F.Supp. 65 (D.D.C.1995), *vacated*, 82 F.3d 1081 (D.C.Cir.1996), striking down section 3184 as unconstitutional. In a subsequent unpublished order, Judge Lamberth granted class certification and extended his declaratory judgment to all potential extraditees. Judge Lamberth also enjoined the Secretary of State from extraditing any fugitives from the United States to foreign countries. *See Lobue v. Christopher*, No. CA 95–1097 (D.D.C. Sept. 15, 1995) (order granting class certification and class-wide injunction).

   Thereafter, the D.C. Circuit issued an order preliminarily staying Judge Lamberth's class-wide injunction pending appeal. The Government, however, did not request a stay of the declaratory judgment or class certification. After oral argument, the D.C. Circuit issued an opinion vacating the judgment of the district court for lack of jurisdiction; however, it stayed its mandate pending a petition for rehearing and suggestion for rehearing in banc. *See LoBue v. Christopher*, 82 F.3d 1081 (D.C.Cir. 1996) (order withholding issuance of mandate). The petition for rehearing and the suggestion for rehearing in banc were denied on July 1, 1996. Lo Duca now argues that Judge Lamberth's declaratory judgment and class certification,

which still remain operative, are binding on this Court. However, the judgment in this case issued by Judge Trager in the Eastern District was entered before Judge Lamberth granted his declaratory judgment and class certification. Though Lo Duca might have been able to bring a successive habeas corpus petition after losing in the Eastern District, he elected to appeal from that judgment. Having done so, he was not free to participate in simultaneous litigation in the District of Columbia. *Cf. Sanders v. United States*, 373 U.S. 1, 18, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963) ("Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation...."). We believe that this Court may decide all issues raised on this appeal, regardless of the disposition of *Lobue*.

2. In the absence of section 3184, the Executive Branch would retain plenary authority to extradite. *See Fong Yue Ting v. United States*, 149 U.S. 698, 714, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893) ("[T]he surrender, pursuant to treaty stipulations, of persons residing or found in this country and charged with crime in another, may be made by the executive authority of the President alone, when no provision has been made by treaty or by statute for an examination of the case by a judge or magistrate.").

the Executive Branch retains plenary discretion to refuse extradition.

The extradition hearing conducted pursuant to section 3184 "is not ... in the nature of a final trial by which the prisoner could be convicted or acquitted of the crime charged against him...." *Benson v. McMahon*, 127 U.S. 457, 463, 8 S.Ct. 1240, 1243, 32 L.Ed. 234 (1888). Instead, it is "essentially a preliminary examination to determine whether a case is made out which will justify the holding of the accused and his surrender to the demanding nation." *Ward v. Rutherford*, 921 F.2d 286, 287 (D.C.Cir.1990) (citation omitted), *cert. dismissed*, 501 U.S. 1225, 111 S.Ct. 2844, 115 L.Ed.2d 1013 (1991). As the Supreme Court has stated, "The function of the committing magistrate is to determine whether there is competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction." *Collins v. Loisel*, 259 U.S. 309, 316, 42 S.Ct. 469, 472, 66 L.Ed. 956 (1922). The judicial officer who conducts an extradition hearing "thus performs an assignment in line with his or her accustomed task of determining if there is probable cause to hold a defendant to answer for the commission of an offense." *Ward*, 921 F.2d at 287; *see also In re McMullen*, 989 F.2d 603, 611 (2d Cir.) (in banc) ("What is at issue in the proceeding, therefore, 'is not punishability but prosecutability.'") (quoting M. Cherif Bassiouni, *International Extradition and World Public Order* 524 (1974)), *cert. denied*, 510 U.S. 913, 114 S.Ct. 301, 126 L.Ed.2d 249 (1993).

■ If the extradition officer issues a certificate of extraditability, the Secretary of State "may" order the fugitive to be delivered to the extraditing nation. 18 U.S.C. § 3184. The Secretary of State, however, is under no legal duty to do so. *See* 6 M. Whiteman, *Digest of International Law* 1046 (1968) ("[T]he judicial branch cannot, as a matter of domestic law, bind the executive to grant extradition."). On the other hand, if the extradition officer declines to issue a certificate of extraditability, the complaint is dismissed and the Secretary of State has no authority to order the surrender of the fugitive. *See In re Mackin*, 668 F.2d 122, 125–28 (2d Cir.1981). While a new extradition complaint may be submitted, unless it leads to a certificate of extraditability, no extradition is allowed. *See United States v. Doherty*, 786 F.2d 491, 495 (2d Cir.1986); *cf. Collins v. Loisel*, 262 U.S. 426, 429–30, 43 S.Ct. 618, 619, 67 L.Ed. 1062 (1923) (successive complaints seeking extradition do not violate Double Jeopardy Clause).

■ In this case, Lo Duca's primary contention is that the legal framework established by the extradition statute is unconstitutional. We note at the outset that Lo Duca raises this argument for the first time on appeal. The general rule is that "a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). That rule, however, is one of prudence and not appellate jurisdiction. We retain broad discretion to consider issues not raised initially in the District Court. *See Austin*, 5 F.3d at 601. Since the argument proffered by Lo Duca involves constitutional notions of separation of powers, the Government's response that Lo Duca has waived his claims "cannot be dispositive." *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 851, 106 S.Ct. 3245, 3257, 92 L.Ed.2d 675 (1986). In this case, we think that the constitutional issues advanced by Lo Duca are sufficiently important that they should be assessed on their merits.[3]

■ Lo Duca presents two alternative contentions, consideration of which depends upon our resolution of an initial question: do judicial officers acting pursuant to section 3184 exercise the "judicial power" of the United States under Article III of the Constitution? If an extradition officer does exercise Article III power, then Lo Duca contends that the statutory scheme is unconstitutional since it subjects Article III judgments to revision by the Executive Branch. On the other hand, if an extradition officer does not exercise Article III

---

**3.** We need not consider Lo Duca's contention that, insofar as his claim involves a "structural" challenge to section 3184 rather than a challenge asserting "personal" rights, *Schor* divests us of our discretion and requires us to consider his constitutional claims.

power, then Lo Duca contends that Congress has unconstitutionally authorized federal judges and magistrate judges to engage in extrajudicial activities.

This is not the first time that our Circuit has considered the question of whether extradition officers exercise Article III power. In *Austin,* we recently held that the function performed by an extradition officer is not an exercise of the judicial power of the United States. *Austin,* 5 F.3d at 603. This holding accords with the decisions of the First, Eleventh, and District of Columbia Circuits. *See In re Extradition of Howard,* 996 F.2d 1320, 1325 (1st Cir.1993); *Martin v. Warden,* 993 F.2d 824, 828 (11th Cir.1993); *Ward,* 921 F.2d at 288 n. 2; *see also In re Kaine,* 55 U.S. (14 How.) 103, 119, 14 L.Ed. 345 (1852) (Curtis, J., concurring). *But see United States v. Lawrence,* 3 U.S. (3 Dall.) 42, 53–54, 1 L.Ed. 502 (1795).

Lo Duca contends that our holding in *Austin* should be reconsidered, even though in this Circuit a subsequent panel may not overrule the decision of a prior panel. *See Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) ("A decision of a panel of this Court is binding unless and until it is overruled by the Court en banc or by the Supreme Court."). Though *Austin* did not consider the same constitutional claims raised by Lo Duca, we see no reason to depart from our precise holding that extradition officers do not exercise Article III power. We believe nonetheless that some amplification of that holding may assist in assessing Lo Duca's subsequent contentions.

Our holding in *Austin* derives primarily from the Supreme Court's decision in *In re Metzger,* 46 U.S. (5 How.) 176, 12 L.Ed. 104 (1847) (Little, Brown & Co. 1870), which held that the Court lacked jurisdiction to review the judgment of an extradition officer.[4] The Court based its decision on the fact that "the case ... was heard and decided by the district judge at his chambers, and not in court...." *Id.* at 191. Presumably, the Court was describing the role of the district

judge rather than the place of his decisionmaking, since the Court later noted that the judge was exercising "a special authority" for which no provision existed regarding the appealability of his decision. *Id.* Thus, the Supreme Court held that it could not maintain appellate jurisdiction; moreover, since original jurisdiction was also lacking, it could not issue a writ of *habeas corpus* on Metzger's behalf. *Id.* at 192; *see Mackin,* 668 F.2d at 125.

The statement in *Metzger* that extradition officers exercise "a special authority" implies that their adjudicatory powers do not derive from Article III. Rather, extradition officers have been said to act in a "non-institutional capacity." *See Austin,* 5 F.3d at 603 (quoting *Howard,* 996 F.2d at 1325). Although Lo Duca asserts that *Metzger* was overruled when Congress enacted section 3184, this Court in *Mackin* reached a different conclusion. Judge Friendly wrote that "[n]othing on the face of the statute or in its legislative history shows an intention to alter the Supreme Court's ruling [in *Metzger* ] with respect to appealability." *Mackin,* 668 F.2d at 126. "During the floor debates of the proposed extradition act Senator Dayton referred to the Supreme Court's decision in the *Metzger* case, but did not intimate that the bill would alter the result of that case." *Id.* at 126 n. 7 (citing Cong.Globe, 30th Cong., 1st Sess. 868 (1848)). Thus, the rule in *Metzger* remains viable, and the fact that decisions of extradition officers are non-appealable strongly indicates that such officers do not exercise Article III power.

This conclusion is bolstered by the fact that, although direct judicial review of an extradition proceeding is not available, there is the possibility for what has been called "executive revision," pursuant to the discretionary authority of the Executive Branch to refuse extradition. *See generally* Paul M. Bator et al., *Hart & Wechsler's The Federal Courts and the Federal System* 95–97 (3d ed. 1988). The first case involving executive revision arose in a different context in *Hayburn's Case,* 2 U.S. (2 Dall.) 408, 1 L.Ed. 436

---

4. *Metzger* was decided prior to the enactment of section 3184. In that case, the Government was not required to seek approval from an extradition officer; however, it did so nonetheless, and the

Supreme Court found that the Executive had acted "very properly" in that regard. *Metzger,* 46 U.S. (5 How.) at 188–89.

(1792) (Little, Brown & Co. 1855). Congress had provided that the circuit courts should decide in the first instance whether individual veterans were eligible for disability pensions. These determinations, however, were subject to revision by the Secretary of War. Chief Justice Jay and Justice Cushing, sitting as members of the Circuit Court of the District of New York, held that "the [pension adjusting] duties assigned to the Circuit Courts ... are not of [judicial] description ...; inasmuch as [the statute] subjects the decisions of these courts ... to the consideration and suspension of the Secretary at War...." *Id.* at 410 n. 1. Similar statements regarding the non-judicial nature of the power granted by Congress were made by Justices Wilson, Blair, and Iredell in their capacities as circuit judges. *Id.* Thus, the various Justices held that the statute failed to accomplish a grant of judicial power under Article III, and in that regard, the fact that the statute contemplated executive revision was dispositive.

· Chief Justice Jay and Justice Cushing additionally explained that the statute could be considered, not as a grant of Article III power, but "as appointing commissioners for the purposes mentioned in it...." *Id.* (emphasis added). "[T]he Judges of this Court regard themselves as being the commissioners designated by the act, and therefore as being at liberty to accept or decline that office." *Id.* The Justices concluded that "the Judges of this Court will ... adjourn the court from day to day ... and ... proceed as commissioners to execute the business of this act in the same court room, or chamber." *Id.* Notably, the Justices found no constitutional impediment to their rendering adjudicatory decisions under the statute, as long as those decisions were distinct from their judicial functions regarding cases and controversies under Article III.

In *United States v. Ferreira,* 54 U.S. (13 How.) 40, 14 L.Ed. 40 (1852) (Little Brown &

Co. 1870), the Supreme Court considered a similar statute authorizing federal district judges in Florida to adjust certain claims made by the Spanish inhabitants of that state against the United States. *Id.* at 45. Those determinations were subject to approval by the Secretary of the Treasury. *Id.* The Supreme Court held that "such a tribunal is not a judicial one.... The authority conferred on the respective judges was nothing more than that of a commissioner...." *Id.* at 47. As the Supreme Court elaborated:

> The powers conferred by these acts of Congress upon the judge ... are, it is true, judicial in their nature. For judgment and discretion must be exercised by both of them. But it is nothing more than the power ordinarily given by law to a commissioner appointed to adjust claims to lands or money under a treaty.... [It] is not judicial ..., in the sense in which judicial power is granted by the constitution to the courts of the United States.

*Id.* at 48. Thus, the Supreme Court found it unexceptional that the judges, as commissioners, acted in an "adjudicatory" capacity.[5]

Instead of focusing on the misleading distinction between adjudicatory and non-adjudicatory functions, *Ferreira* relied on the fact that the decisions of the district judges were subject to executive revision. The Supreme Court found it "too evident for argument" that the statute did not confer Article III power since

> neither the evidence, nor [the judge's] award, are to be filed in the court in which he presides, nor recorded there; but he is required to transmit, both the decision and the evidence upon which he decided, to the Secretary of the Treasury; and the claim is to be paid if the Secretary thinks it just and equitable, but not otherwise.

*Id.* at 46–47. Thus, the fact of executive revision led the Supreme Court in *Ferreira*

---

5. The Constitution itself provides numerous situations where some form of adjudication is required outside the context of Article III. For example, the executive decision to grant a Presidential pardon may be based on a review of the law and facts that would normally be reserved to the province of courts. Similarly, the executive decision to veto legislation may be based on an

opinion that such legislation is unconstitutional. *See* Bator et al., *Hart & Wechsler's The Federal Courts and the Federal System, supra,* at 471 ("[T]he concept of 'the judicial power' *cannot* be defined so as ... to create a monopoly for the judges in the adjudicatory task of finding facts and determining the meaning and applicability of provisions of law.") (emphasis in original).

to hold that those judges, acting as commissioners, did not exercise Article III power. Similarly, in this case, it is dispositive that, since the decisions of extradition officers are subject to revision by the Secretary of State, those officers do not exercise judicial power within the meaning of Article III. *See Doherty,* 786 F.2d at 499 n. 10 ("The ... function of issuing the certificate [of extraditability is] nonjudicial because ... the Secretary of State is not bound to extradite even if the certificate is granted.").[6]

Lastly, we point out that, as a matter of statutory language, section 3184 closely tracks the holdings of *Metzger, Hayburn's Case,* and *Ferreira* by granting jurisdiction over extradition complaints not to "courts" but to individual enumerated "justices," "judges," and "magistrates," including judges of state courts of general jurisdiction. *See* 18 U.S.C. § 3184. Thus, by its terms, "§ 3184 vests individual *judges* with jurisdiction over extradition requests." *Mackin,* 668 F.2d at 130 n. 11 (emphasis in original). This distinction between "courts" and "judges" in the context of extradition proceedings has been long recognized. *See Shapiro v. Ferrandina,* 478 F.2d 894, 901 n. 3 (2d Cir.), *cert. dismissed,* 414 U.S. 884, 94 S.Ct. 204, 38 L.Ed.2d 133 (1973); *Jimenez v. Aristeguieta,* 290 F.2d 106, 107 (5th Cir.1961).[7] We note that, traditionally, it is "courts" and not "judges" that exercise Article III power. *See* U.S. Const. art. III, § 1 ("The judicial power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."). The use of the word "judges" in section 3184 is more consistent with a statute appointing commissioners "by official, instead of personal descriptions." *Hayburn's Case,* 2 U.S. (2 Dall.) at 410 n. 1.[8]

---

**6.** Lo Duca notes that, as a practical matter, extradition officers certainly appear to exercise judicial power—they issue arrest warrants, preside in courtrooms, and use other judicial resources. These actions, however, are not incompatible with their designation as commissioners acting in a non-Article III capacity. Their authority to issue arrest warrants derives not from any inherent judicial power, but rather from the text of section 3184 itself. *See* 18 U.S.C. § 3184. Lo Duca does not contend that this task is such an "essential attribute of judicial power" that it can be exercised only within the confines of Article III. *See Schor,* 478 U.S. at 851, 106 S.Ct. at 3257; *cf. Shadwick v. City of Tampa,* 407 U.S. 345, 92 S.Ct. 2119, 32 L.Ed.2d 783 (1972) (administrative clerk of municipal court may issue arrest warrants).

As for the fact that extradition officers routinely preside in courtrooms and use other judicial resources in carrying out their duties, we see nothing exceptional in the use of such resources for extrajudicial functions. *See Hayburn's Case,* 2 U.S. (2 Dall.) at 410 n. 1 ("[T]he Judges of this Court will ... proceed as commissioners to execute the business of this act in the same court room, or chamber."); *see also* 28 U.S.C. § 331 (1994) (contemplating that Chief Judges of Courts of Appeals may use judicial resources to participate in Judicial Conference of United States); 28 U.S.C. § 332 (1994) (contemplating that judges may use judicial resources to participate in circuit judicial councils); *Chandler v. Judicial Council,* 398 U.S. 74, 86 n. 7, 90 S.Ct. 1648, 1654 n. 7, 26 L.Ed.2d 100 (1970) (upholding constitutionality of 28 U.S.C. § 332).

**7.** In contexts other than extradition, the textual difference between "courts" and "judges" may not necessarily be significant. *See In re United*

*States,* 194 U.S. 194, 196, 24 S.Ct. 629, 630, 48 L.Ed. 931 (1904).

**8.** Lo Duca calls our attention to an interesting peculiarity in the history of section 3184. He notes that the extradition statute, as originally drafted, included a phrase stating that state judges and commissioners are "hereby severally vested with power, jurisdiction, and authority" over extradition proceedings. Act of Aug. 12, 1848, ch. 167, 9 Stat. 302, 302. That phrase was subsequently omitted when the statute was reworded during the first codification of the Statutes at Large. *Compare id. with* Revised Statutes of the United States, tit. 66, § 5270 (1st ed. 1875). Later codifications did not mention the revision, and its rationale remains a mystery. *See* Revised Statutes of the United States, tit. 66, § 5270 (2d ed. 1878); 18 U.S.C. § 3184 (1994); *see also* Ralph H. Dwan & Ernest R. Feidler, *The Federal Statutes—Their History and Use,* 22 Minn. L.Rev. 1008, 1014–15 (1938) (noting that initial draft of Revised Statutes was notorious for unauthorized changes in statutory language).

Lo Duca argues that the use of the words "vest" and "jurisdiction" in the original statute implies a Congressional grant of Article III power. We note as an initial matter, however, that after 120 years of settled judicial understanding, it is not so clear that the original language of the statute should control. *See United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.,* 508 U.S. 439, 449 & n. 4, 113 S.Ct. 2173, 2179–80 & n. 4, 124 L.Ed.2d 402 (1993) (adoption of Revised Statutes in 1874 involved Congressional re-enactment of all statutes in effect at that time and simultaneous repeal of all prior ones); Cass R. Sunstein, *Section*

Having examined the text of the statute, its structural correlation with Article III, and the relevant historical precedents, we conclude that our holding in *Austin* was correct—extradition officers do not exercise judicial power under Article III of the Constitution. *Austin*, 5 F.3d at 603. We therefore turn to Lo Duca's following arguments, which contend that section 3184 is unconstitutional precisely because it does *not* confer Article III power.

## A. *Tidewater* Claim

■ Lo Duca first argues that section 3184 violates the doctrine of separation of powers insofar as it seeks to require Article III courts to conduct non-Article III extradition proceedings. *See National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949). In *Tidewater*, the Supreme Court confronted the question whether Congress could expand the jurisdiction of federal courts beyond the class of cases and controversies enumerated in Article III. In three separate opinions, six Justices reaffirmed the traditional view that federal courts are courts of limited jurisdiction whose judicial powers are bounded by Article III. *See id.* at 607, 69 S.Ct. at 1185 (Rutledge, J., joined by Murphy, J., concurring in the judgment); *id.* at 635, 69 S.Ct. at 1204 (Vinson, C.J., joined by Douglas, J., dissenting); *id.* at 647, 69 S.Ct. at 1196 (Frankfurter, J., joined by Reed, J., dissenting). Justice Jackson expressed a contrary view in his plurality opinion announcing the judgment of the Court. *Id.* at 583, 69 S.Ct.

at 1173 (Jackson, J., joined by Black and Burton, JJ.). He wrote that, under Article I, Congress could grant jurisdiction for federal courts to hear non-Article III cases. *See Tidewater*, 337 U.S. at 592–93, 69 S.Ct. at 1178. Justices Rutledge and Murphy, who "strongly dissent[ed]" from that reasoning, nonetheless concurred in the result on other grounds. *See id.* at 604, 626, 69 S.Ct. at 1184, 1195 (Rutledge, J., concurring in the judgment) (calling the opinion of Justice Jackson a "dangerous doctrine"). *See generally* Bator et al., *Hart & Wechsler's The Federal Courts and the Federal System*, *supra*, at 474–75.

In cases reaching as far back as *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the Supreme Court has held that Congress may not expand the jurisdiction of federal courts beyond the limits established by Article III. *Id.* at 174; *see Kline v. Burke Construction Co.*, 260 U.S. 226, 234–35, 43 S.Ct. 79, 83, 67 L.Ed. 226 (1922) ("[Congress] may give, withhold or restrict such jurisdiction at its discretion, provided it be not extended beyond the boundaries fixed by the Constitution."); *Sheldon v. Sill*, 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1850) ("The Constitution has defined the limits of the judicial power of the United States. . . ."); *Hodgson v. Bowerbank*, 9 U.S. (5 Cranch) 303, 304, 3 L.Ed. 108 (1809) (Marshall, C.J.) ("Turn to the article of the constitution of the United States, for the statute cannot extend the jurisdiction beyond the limits of the constitution."). Most recently, in *Seminole Tribe of Florida v. Florida*, ——

*1983 and the Private Enforcement of Federal Law*, 49 U.Chi.L.Rev. 394, 408 (1982) (arguing that revision of 1874 was intended to clarify numerous conflicting and ambiguous provisions, and therefore Revised Statutes should be considered authoritative and not be parsed by reference to pre-codification law). *But see Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 624–27, 99 S.Ct. 1905, 1919–21, 60 L.Ed.2d 508 (1979) (Powell, J., concurring); *United States v. Ryder*, 110 U.S. 729, 740, 4 S.Ct. 196, 201, 28 L.Ed. 308 (1884) ("It will not be inferred that the legislature, in revising and consolidating the laws, intended to change their policy, unless such intention be clearly expressed.").

In any event, we do not consider the words "vest" and "jurisdiction" to be dispositive. First, those words apply only to state judges and commissioners, not to federal justices or judges.

This fact strongly undercuts the interpretation proffered by Lo Duca since it would be odd, to say the least, for Congress, in assigning a single task, to vest unappealable Article III power in state judges and commissioners, who lack lifetime tenure and undiminishable salary, but not in federal justices or judges. Second, we note that similar "jurisdictional" language has been used by Congress in other non-Article III contexts. *See* 26 U.S.C. § 7442 (1994) ("jurisdiction" of United States Tax Court); 28 U.S.C. § 1491(a)(1) (1994) ("jurisdiction" of Court of Federal Claims); 38 U.S.C. § 7252 (1994) ("jurisdiction" of United States Court of Veteran Appeals). The mere use of the word "jurisdiction" in those statutes does not transform expressly designated Article I courts into Article III courts. *See* 26 U.S.C. § 7441 (1994); 28 U.S.C. § 171 (1994); 38 U.S.C. § 7251 (1994).

U.S. ——, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), the Supreme Court stated that "Congress could not expand the jurisdiction of the federal courts beyond the bounds of Article III." *Id.* at ——, 116 S.Ct. at 1128 (citing *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60). Lo Duca relies on these cases to contend that the Constitution prevents Congress from vesting federal courts with jurisdiction over non-Article III extradition complaints.

■ Without questioning these cases, the Government responds that federal *courts* are not the subject of section 3184. Rather, "§ 3184 vests individual *judges* with jurisdiction over extradition requests." *Mackin,* 668 F.2d at 130 n. 11. This distinction between "courts" and "judges" is dispositive. As Judge Friendly noted, section 3184 forbids "courts" to issue certificates of extraditability. *Doherty,* 786 F.2d at 499. "We thus need not consider whether ... Congress could constitutionally vest an Article III *court* with the nonjudicial function of issuing the certificate...." *Id.* at 499 n. 10 (emphasis in original). Only individual justices, judges, and magistrate judges are authorized to act under the statute. Since they function, as in *Hayburn's Case* and in *Ferreira,* as commissioners, they are not bound by the limits of Article III.

### B. *Mistretta* Claim

■ Lo Duca next argues that, insofar as section 3184 requires judges to act in an extrajudicial capacity, the statute runs afoul of *Mistretta v. United States,* 488 U.S. 361, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989). In *Mistretta,* the Supreme Court was concerned with the possibility that Congress might compromise the independence of Article III judges by requiring them to participate in extrajudicial activities. This concern, however, does not apply with equal force to those who are not Article III judges. Thus, Lo Duca's claim founders at the outset since his extradition proceedings were conducted solely by federal magistrate judges. Then–Magistrate Judge Ross issued the warrant under which Lo Duca was arrested. Magistrate Judge Gold conducted the subsequent extradition hearing and granted the certificate of extraditability. Since federal magistrate judges are not Article III judges, the Constitution does not accord them the same protections against Congressional expansion of their duties. *See Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 79–80, 102 S.Ct. 2858, 2876, 73 L.Ed.2d 598 (1982) (plurality opinion) (magistrate judges are "non-Art[icle] III officers"); *Wingo v. Wedding,* 418 U.S. 461, 467 n. 4, 94 S.Ct. 2842, 2847 n. 4, 41 L.Ed.2d 879 (1974) (magistrate judges are " 'outside the pale of Article III' ") (quoting *Wedding v. Wingo,* 483 F.2d 1131, 1133 n. 1 (6th Cir.1973)). Nothing in *Mistretta* suggests that federal magistrate judges would be precluded from conducting extradition proceedings.

■ Lo Duca argues nonetheless that, if Article III judges cannot act as extradition officers, then they lack the power to delegate those duties to a magistrate judge under the Federal Magistrates Act, 28 U.S.C. § 636(b) (1994). This argument presupposes that magistrate judges serve as extradition officers in their capacity as "adjuncts" to Article III courts under section 636(b). Yet, as this Court has pointed out, magistrate judges acting under section 3184 do not rely on the Federal Magistrates Act for their authority. *Jhirad v. Ferrandina,* 536 F.2d 478, 486 (2d Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 97, 50 L.Ed.2d 98 (1976). Rather, section 3184 contains its own independent grant of authority to allow magistrate judges to hear extradition complaints. 18 U.S.C. § 3184. Once a magistrate judge is authorized to act under section 3184, that officer does not need subsequent permission from a supervising court on a case-by-case basis. *See In re Farez,* 8 F. Cas. 1007, 1008 (C.C.S.D.N.Y.1870) (No. 4,645). A magistrate judge serving as an extradition officer pursuant to section 3184 acts as a commissioner, in the same capacity as any other enumerated justice or judge under section 3184.

In any event, even if Lo Duca's extradition proceedings had been conducted by a federal judge, there would be no violation of *Mistretta.* On the contrary, *Mistretta* expressly states that federal judges may participate in extrajudicial activities as long as two requirements are met. First, the judge must be

acting "in an individual, not judicial, capacity." *Mistretta,* 488 U.S. at 404, 109 S.Ct. at 672. Second, "a particular extrajudicial assignment [must not] undermine[ ] the integrity of the Judicial Branch." *Id.*[9] We have already held that judges acting pursuant to section 3184 do so as commissioners in an individual capacity. We now consider whether the particular task of adjudicating extradition complaints might undermine the integrity of the Judicial Branch.

*Mistretta* was concerned with two possible subversions of judicial integrity. The first was the possibility that Congress might force federal judges to perform extrajudicial tasks. *See id.* at 405–06, 109 S.Ct. at 672; *but see id.* at 406 n. 29, 109 S.Ct. at 672 n. 29 (Congress may require Chief Judges of Courts of Appeals to participate in Judicial Conference of United States). In this case, however, we have no reason to believe that any federal judge has been forced to conduct an extradition proceeding. Moreover, since we are instructed to construe federal statutes to avoid constitutional infirmity, we read section 3184 as merely *authorizing* federal judges to act as extradition officers. *See Jimenez v. Aristeguieta,* 311 F.2d 547, 554 (5th Cir.1962), *cert. denied,* 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963); *see also Hayburn's Case,* 2 U.S. (2 Dall.) at 410 n. 1 ("[T]he Judges of this Court regard themselves as being the commissioners designated by the act, and therefore as being at liberty to accept or decline that office."). Section 3184 states that an extradition officer "*may* ... issue his warrant for the apprehension of the person so charged, that he *may* be brought before such justice, judge, or magistrate, to the end that the evidence of criminality *may* be heard and considered." 18 U.S.C. § 3184 (emphasis added).[10]

*Mistretta* was also concerned with the possibility that certain extrajudicial activities might undermine the integrity of the Judicial Branch by weakening public confidence. *See*

*Mistretta,* 488 U.S. at 407–08, 109 S.Ct. at 673. We believe that, in this particular context, history sufficiently allays this concern. For nearly 150 years, federal judges have adjudicated extradition complaints under section 3184 with no indication of any adverse consequences. Of course, this is hardly surprising since an extradition proceeding is "an essentially neutral endeavor and one in which judicial participation is peculiarly appropriate." *Id.* at 407, 109 S.Ct. at 673. We conclude that the extrajudicial duties authorized by section 3184 do not undermine the integrity of the Judicial Branch, and *Mistretta* does not prohibit federal judges from hearing extradition complaints.

## C. Appointments Clause Claim

Lo Duca's final argument invokes the Appointments Clause of the Constitution. U.S. Const. art. II, § 2, cl. 2. He contends that, insofar as judicial officers acting under section 3184 do not serve in their traditional capacity as "justice," "judge," or "magistrate," they must receive a second appointment to carry out their duties as "extradition officer." This argument might carry some weight if the description of extradition officers in section 3184 included persons who held no prior office, but extradition officers have already been appointed to one position—either justice, judge, or magistrate judge. Where Congress provides additional duties that are "germane" to an already existing position, the Appointments Clause does not require a second appointment. *Weiss v. United States,* 510 U.S. 163, 171–175, 114 S.Ct. 752, 758–59, 127 L.Ed.2d 1 (1994); *Shoemaker v. United States,* 147 U.S. 282, 300–301, 13 S.Ct. 361, 391, 37 L.Ed. 170 (1893). The "germaneness" standard set forth in *Shoemaker* is fully met in this case. The duties performed by an extradition officer are virtually identical to those performed every day by judges and magistrate judges in the course of preliminary criminal pro-

---

9. *Mistretta* pointed to *Hayburn's Case* and *Ferreira* as two examples where judges acted permissibly as commissioners in performing adjudicatory functions outside of Article III. *Mistretta,* 488 U.S. at 403, 109 S.Ct. at 671.

10. It is worth bearing in mind that "justices" as well as "judges" are included in the description of extradition officers. It is highly unlikely that Congress intended to require Justices of the Supreme Court to perform the relatively ministerial task of determining whether a particular fugitive is extraditable.

ceedings. This case is a far cry from *Mistretta*, where participation on the Sentencing Commission entailed duties that were substantially different from a judge's normal tasks. Since extradition proceedings are sufficiently germane to the traditional duties of judges and magistrate judges, under the Appointments Clause, these judicial officers do not require a second appointment to hear extradition complaints.[11]

## II. Remaining Issues

Lo Duca also presents two non-constitutional claims: (1) the Magistrate Judge failed to issue a proper extradition order in accordance with the Italian–American extradition treaty, and (2) the Italian crime of "association of mafia type" is not an extraditable offense. Both claims are unavailing.

### A. Compliance with the Extradition Treaty

Article X of the Extradition Treaty sets forth the various requirements that must be met in order to support a formal request for extradition. *See* Extradition Treaty, art. X, T.I.A.S. No. 10837. Lo Duca argues that in this case the requirements of Article X were not met because Magistrate Judge Gold failed to enter the supporting documents into evidence, and certain necessary documents were not presented in their proper format.

■ Though this claim is of arguable merit, Lo Duca has waived it by failing to object at his extradition hearing. "Non-jurisdictional objections must ... be timely raised or they are waived." *Jhirad*, 536 F.2d at 486; *see also Austin*, 5 F.3d at 601 (non-jurisdictional and non-constitutional arguments deemed to have been forfeited). The Magistrate Judge, while reviewing the supporting documents and marking them for identification, asked counsel for Lo Duca whether he had any objections:

> *The Court:* "I take it Mr. Abell, that I'm right in saying you haven't raised a challenge to the completeness under Article 10."

*Mr. Abell:* "No."

*The Court:* "But since I do need to make this independent of you, I want to do that. Okay."

In light of Lo Duca's express waiver, his arguments concerning procedural non-compliance with Article X have been forfeited.

### B. Dual Criminality

■ Lo Duca contends that the District Court erred in finding that the Italian crime of "association of mafia type" is an extraditable offense. The Extradition Treaty contains a typical "dual criminality" requirement—the offense for which the fugitive is being extradited must be punishable under both Italian and United States criminal law. *See* Extradition Treaty, art. II(1), T.I.A.S. No. 10837. Lo Duca argues that the Italian anti-mafia law, as applied in the United States, would be unconstitutional because it punishes mere membership in an association.

The Italian anti-mafia law, however, is not so broadly written. The statute clearly defines an "association of mafia type" as follows:

> An association shall be of mafia type when its members avail themselves of the power of intimidation and of the condition of subjection and conspiracy of silence deriving therefrom for the purpose of committing crimes, of acquiring directly or indirectly the management or control of economic activities, concessions, authorizations, contract works or public services or of obtaining unlawful profits or advantages for themselves or others.

Codice penale art. 416 bis. (Italy). Thus, the Italian anti-mafia law appears to be quite analogous to the United States conspiracy law, 18 U.S.C. § 371 (1994), and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961–63 (1994).

■ Moreover, in applying the dual criminality requirement against a foreign statute, we have never considered only the statutory

---

11. Some might question whether the task of hearing extradition complaints, which is a *non-judicial* task for purposes of Article III, is nevertheless "germane" to the traditionally *judicial* task of determining probable cause. We think that this situation falls within a narrow (perhaps unique) set of circumstances where the function is technically non-judicial in nature, but sufficiently similar to judicial functions so as to satisfy the "germaneness" requirement.

text. Rather, we have looked towards the *conduct* of the accused to see if it falls within the proscription of American criminal law. *See Spatola v. United States,* 925 F.2d 615, 618–19 (2d Cir.1991) (" '[T]he *acts* for which Spatola was convicted, and the *actions* of the group for which Spatola as co-conspirator was liable, are clearly illegal here.' ") (emphasis added) (quoting *Spatola v. United States,* 741 F.Supp. 362, 373 (E.D.N.Y.1990)); *see also Collins,* 259 U.S. at 311–12, 42 S.Ct. at 470 ("It is enough [to satisfy the dual criminality requirement] if the particular *act* charged is criminal in both jurisdictions.") (emphasis added).

In this case, the evidence at the Italian trial showed that Lo Duca, as a member of the Sicilian Mafia in New York City, had conspired with numerous other co-conspirators to transport cocaine throughout the United States, South America, and Europe. Specifically, the evidence disclosed various shipments of cocaine over several years from Miami to New York, and one shipment of more than 550 kilograms of cocaine from Colombia to Sicily. Moreover, there was further evidence of Lo Duca's participation in another plan to ship heroin from Sicily to the United States. In light of these facts, Lo Duca's conduct clearly would have constituted a crime under either 18 U.S.C. § 371 or 18 U.S.C. § 1962 had he been prosecuted in the United States.

## Conclusion

Since the United States extradition statute, 18 U.S.C. § 3184, does not violate the doctrine of separation of powers, and Lo Duca's other claims are not grounds for reversal, the judgment of the District Court is affirmed.